AB: MT: RN
F.#2009R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    10 CR 147 (S-1)(SLT)

    - against -

JAMES BOMBINO, <u>et al.</u>,

       Defendants.

- - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANTS' PRETRIAL MOTIONS

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

AMY BUSA
MICHAEL TREMONTE
RACHEL NASH
Assistant United States Attorneys
    (Of Counsel)

## Table of Contents

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . 1

I.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . 3

     A.   Charges . . . . . . . . . . . . . . . . . . . . . 3

     B.   Discovery . . . . . . . . . . . . . . . . . . . . 6

II.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . 7

     A.   The Defendants' Requests For
          Severance Should Be Denied . . . . . . . . . . . . 7

          1.   The Defendants Were Properly Joined Under
               Fed. R. Crim. P. 8.. . . . . . . . . . . . . 9

          2.   There Is Insufficient Risk of Spillover
               Prejudice to Warrant Separate Trials
               Under Rule 14 . . . . . . . . . . . . . . . 12

          3.   Bruton v. United States Also Does Not
               Warrant Severance. . . . . . . . . . . . . .16

               a.   Applicable Law . . . . . . . . . . . . 17

               b.   Analysis . . . . . . . . . . . . . . . 19

          4.   No Defendant Advances a Defense Sufficiently
               Antagonistic to Warrant Severance . . . . . . 21

     B.   The Motion to Dismiss Count Six is
          Without Merit . . . . . . . . . . . . . . . . . .26

          1.   The Phrase "Business of Lending Money"
               Contained in 18 U.S.C. § 1961(6) Is
               Not Unconstitutionally Vague . . . . . . . . .27

          2.   Count Six Is Not Impermissibly Vague
               As Pled in the Indictment . . . . . . . . . . 35

C.   The Defendants' Discovery Demands Are
     Without Merit or Premature . . . . . . . . . . . . 36

     1.   Trial Exhibits and Transcripts . . . . . . . . .37

     2.   Identification of Recordings On
          Which Defendants' Are Referenced . . . . . . . .40

     3.   Brady/Giglio Demands . . . . . . . . . . . . . .40

          a.   The Defendants' Demand for Giglio
               Material Is Premature . . . . . . . . . . .41

          b.   Early Disclosure of Giglio Material
               Risks Witness Intimidation . . . . . . . . 42

          c.   The Government Will Comply With Its
               Obligations Pursuant to Giglio and
               18 U.S.C. § 3500 . . . . . . . . . . . . . 44

     4.   404(b) and Impeachment Evidence . . . . . . . . 46

          a.   Timing for Disclosure of
               404(b) Evidence . . . . . . . . . . . . . .46

          b.   Impeachment . . . . . . . . . . . . . . . .47

          c.   Preza's Request for a Hearing . . . . . . .49

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . .50

**PRELIMINARY STATEMENT**

The defendants Alicia Dimichele ("Dimichele"), Michael Persico ("Persico"), Theodore Persico, Jr. ("Persico, Jr."), Thomas Petrizzo ("Petrizzo"), Anthony Preza ("Preza"), Louis Romeo ("Romeo") and Michael Sciaretta ("Sciaretta") have filed various pretrial motions, seeking severance, dismissal of Count Six of the Superseding Indictment, and certain discovery and evidentiary rulings.

Specifically, Dimichele, Romeo, Preza and Sciaretta (the "non-RICO defendants") each move for severance from the RICO defendants, arguing principally that there will be an unacceptable amount of spillover prejudice from the proof against those defendants charged with RICO in Count One.  Petrizzo, a RICO defendant, and Romeo, a non-RICO defendant, also move for severance under Bruton v. United States, 391 U.S. 123 (1968).  As set forth below, the defendants' motions for severance should be denied because there is insufficient risk of prejudice to the non-RICO defendants, the defendants have not advanced antagonistic defenses and Sciaretta's post-arrest statements can be redacted to meet the requirements of Bruton v. United States, 391 U.S. 123 (1968) and Crawford v. Washington, 541 U.S. 36 (2004).

1

Michael Persico and Theodore Persico, Jr. move for dismissal of Count Six on the grounds it is unconstitutionally vague.  This motion too should be denied because the language contained in 18 U.S.C. § 1961(6)(B) provides fair notice of the conduct that is forbidden by the statute, and the indictment provides the defendants with fair notice of the alleged crime.

Finally, the defendants also make several discovery demands.  First, all defendants request the immediate disclosure of the government's trial exhibits, draft transcripts, a list of recordings on which the defendants are referenced though not overheard, and any information pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).  Second, Michael Persico requests notice of the evidence the government intends to submit pursuant to Federal Rule of Evidence 404(b) by July 1, 2011.  Third, Preza seeks to preclude the government from cross-examining defense witnesses regarding Preza's other bad acts unless they are determined, after a hearing, to be admissible under Federal Rule of Evidence 608(a) or 404(b).  The government respectfully submits that the requests for immediate disclosures are unreasonable, but that, as set forth below, the government will continue to comply with its discovery obligations in a timely manner.  Further, Preza's motion seeking an advisory opinion to preclude the government from using other bad acts as impeachment material on cross-

examination should be denied as it confuses the scope of cross-examination with the admissibility of extrinsic evidence to prove specific instances of a witnesses' other bad acts.

I.   FACTUAL BACKGROUND

   A.   Charges

        On March 3, 2010, the grand jury returned an indictment charging defendants James Bombino, Edward Garofalo, Jr., Michael Persico, and Theodore Persico, Jr., with RICO conspiracy and related crimes and charging Alicia Dimichele with embezzlement of employee benefit funds and conspiracy to commit that crime, and Thomas Petrizzo, Louis Romeo and Michael LNU (Sciaretta) with wire fraud conspiracy.  On November 4, 2010, the grand jury returned a superseding indictment ("S-1") charging defendants James Bombino,[1] Edward Garofalo, Jr., Michael Persico, Theodore Persico, Jr., and Thomas Petrizzo with RICO conspiracy and related crimes and Alicia Dimichele with embezzlement of employee benefit funds and conspiracy to commit that crime, Anthony Preza with financing an extortionate extension of credit and Louis Romeo and Michael Sciaretta with wire fraud conspiracy.  This investigation involved the use of a cooperating witness ("CW-1") who consensually recorded many of the defendants in relation to these crimes.

_____

        [1]   On March 4, 2011, James Bombino pleaded guilty to RICO conspiracy.

The majority of these charges relate to the government's four year proactive investigation involving several Colombo family controlled trucking companies, first, DM Equipment and its related double-breasted companies,[2] including Big R Trucking, and second, All Around Trucking and its related double-breasted companies, including CJP Development.  In summary, the charges in the superseding indictment relate primarily to (1) crimes involving Big R Trucking, such as double-breasting and the extortion of Colombus Construction (see Counts 2-3 and Racketeering Acts 1, 3); (2) crimes committed by defendants employed by or associated with Big R Trucking (see Racketeering Act 2); (3) crimes involving financing for All Around Trucking or extortionate extensions of credit to its principals (see Counts 6, 7, 8 and Racketeering Acts 6); (4) crimes involving All Around Trucking, such as double-breasting and crimes relating to Testa Corporation (see Counts 4, 5, 9, 10, 13 and 14 and Racketeering Acts 5, 7, 8 and 10); and (5) crimes committed by defendants associated with All Around Trucking (see Counts 4, 11 and 12 and Racketeering Act 9).

---

[2]     Double-breasting is the use of non-union workers by a company that is a signatory to a collective bargaining agreement ("CBA") in an effort to avoid the wage and benefit obligations under the CBA.

4

Listed in the chart below is a summary of the criminal counts included in the superseding indictment:

| Counts/ Racketeering Acts | Description | Defendants |
|---|---|---|
| 1 | Racketeering Conspiracy | Bombino, Garofalo, Persico, Persico, Jr., Petrizzo |
| 2 | Conspiracy to Embezzle from Employee Benefit Plans (June 2003 - June 2005) | Dimichele, Garofalo |
| 3/ RA 1 | Embezzlement from Employee Benefit Plans (June 2003 - June 2005) | Dimichele, Garofalo |
| RA 2 | N.Y. Penal Larceny by Extortion - John Doe #1 (September 2004 - October 2004) | Garofalo |
| RA 3 | Extortion/ Extortion Conspiracy - Columbus Construction (November 2004 - December 2004) | Garofalo, Persico, Jr. |
| RA 4 | Larceny by Extortion - John Doe #2 (September 2007 - February 2010) | Garofalo, Persico, Persico, Jr. |
| 4 | Conspiracy to Embezzle from Employee Benefit Plans (April 2009 - February 2010) | Bombino, Persico, Jr. |
| 5/ RA 5 | Embezzlement from Employee Benefit Plans (April 2009 - February 2010) | Bombino, Persico, Jr. |
| 6 | RICO - Collection of Unlawful Debt (May 2009 - February 2010) | Persico, Persico, Jr. |
| 7/ RA 6 | Extortionate Extension of Credit - All Around Trucking (May 2009 - February 2010) | Persico, Persico, Jr. |
| 8 | Financing an Extortionate Extension of Credit (May 2009 - February 2010) | Preza |

| Counts/ Racketeering Acts | Description | Defendants |
|---|---|---|
| 9/ RA 7 | Wire Fraud Conspiracy (Testa Corporation) (June 2009 – February 2010) | Bombino, Persico, Persico, Jr., Petrizzo, Romeo, Sciaretta |
| 10/ RA 8 | Extortion - John Doe # 3 (Trucking Company Owner) (September 2009 - October 2009) | Bombino |
| 11/ RA 9 | Extortion Conspiracy (Furniture Store Owner) (JD #??) (September 2009 - February 2010) | Bombino, Persico |
| 12/ RA 9 | Extortion (Furniture Store Owner) (September 2009 – February 2010) | Bombino, Persico |
| 13/ RA 10 | Extortion Conspiracy (Testa Corporation) (October 2009 to December 2009) | Bombino, Persico, Petrizzo |
| 14/ RA 10 | Extortion (Testa Corporation) (October 2009 to December 2009) | Bombino, Persico, Petrizzo |

B.   Discovery

The government has already provided the defendants with a substantial amount of discovery in this case, consisting principally of: (1) consensual recordings made by six cooperating witnesses (CW-1, CW-2, CW-3, CW-4, CW-5 and CW-6); (2) recordings obtained pursuant to court authorized wiretaps; (3) documents and other evidence obtained pursuant to court authorized search warrants; (4) bank records; and (5) union documents.  The government has also provided draft transcripts of certain

recordings and, by the end of the month, will provide draft transcripts relating to a large portion of the consensual recordings made by CW1.

To the extent possible, the government has identified for the defendants those recordings on which they participate in the recorded conversations.  The consensual recordings and wiretap recordings also include conversations in which the defendants are referenced.  In an abundance of caution, the government has provided additional recordings made by the cooperating witnesses and intercepted pursuant to the wiretaps that may not reference the defendants.  Much of this discovery, including the bulk of the recordings in which the defendants are intercepted or are referenced by others, were provided over one year ago, giving the defendants' ample time for review prior to trial.

II.  ARGUMENT

The government addresses each of the defendants' legal challenges and discovery requests below.

A.  The Defendants' Requests For
Severance Should Be Denied

There is a strong preference in the federal system for joint trials of defendants indicted together.  See Zafiro v. United States, 506 U.S. 534, 539 (1993).  Joint trials "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime

to trial." <u>Bruton v. United States</u>, 391 U.S. 123, 134 (1968).

In explaining the rationale for this preference, the Supreme

Court has stated:

> It would impair both the efficiency and the fairness of
> the criminal justice system to require . . . that
> prosecutors bring separate proceedings, presenting the
> same evidence again and again, requiring victims and
> witnesses to repeat the inconvenience (and sometimes
> trauma) of testifying, and randomly favoring the last-
> tried defendants who have the advantage of knowing the
> prosecution's case beforehand.  Joint trials generally
> serve the interests of justice by avoiding inconsistent
> verdicts and enabling more accurate assessment of
> relative culpability – advantages which sometimes
> operate to the defendant's benefit.  Even apart from
> these tactical considerations, joint trials generally
> serve the interests of justice by avoiding the scandal
> and inequity of inconsistent verdicts.

<u>Richardson v. Marsh</u>, 481 U.S. 200, 210 (1987).

Thus, under <u>Zafiro</u> and its progeny, "joint trials are

favored in the federal courts and should be held unless there is

a serious risk that a joint trial would compromise a specific

trial right of one of the defendants, or prevent the jury from

making a reliable judgment about guilt or innocence." <u>United

States v. Bellomo</u>, 263 F. Supp. 2d 561, 578 (E.D.N.Y. 2003)

(quoting <u>Zafiro</u>, 560 U.S. at 538-39); <u>see also</u> <u>United States v.

Yousef</u>, 327 F.3d 56, 150 (2d Cir. 2003); <u>United States v. Amato</u>,

15 F.3d 230, 237 (2d Cir. 1994) ("Given the balance struck by

Rule 8, which authorizes some prejudice against the defendant, a

defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice.")(internal citations and quotation marks omitted).

To overcome the presumption against severance and in favor of judicial efficiency, criminal defendants bear a heavy burden: they must show that the prejudice from joinder "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." United States v. Walker, 142 F.3d 103, 110 (2d Cir. 1998). The fact that acquittal would be more likely if defendants were tried separately is not a sufficient reason to justify severance. See Zafiro, 506 U.S. at 540.

> 1.   The Defendants Were Properly Joined Under
>       Fed. R. Crim. P. 8

Defendant Romeo asserts, without argument, that the defendants were improperly joined. Defendant Preza asserts that Count 8 lacks sufficient identity of facts or participants to the rest of the indictment. To the contrary, the defendants are properly joined because they participated in conspiracies with the RICO defendants, conspiracies which related to Colombo family-controlled trucking companies.

> Under Rule 8(b) of the Federal Rules of Criminal Procedure, the "indictment may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in

9

one or more counts together or separately.
All defendants need not be charged in each
count."

A "non-frivolous conspiracy charge is sufficient to support joinder of defendants." United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988). Even if the defendant is not alleged to be part of a single conspiracy or RICO enterprise, joinder is proper if a count with which the defendant is charged is integrally related to a conspiracy or RICO charge. See United States v. Cervone, 907 F.2d 332, 341 (2d Cir. 1990). If offenses are committed by differing groups of defendants, Rule 8(b) permits joinder as long as there is overlap between the overall scheme and the individual acts in accordance with that scheme. See United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (joinder appropriate where there were two groups of defendants charged with separate conspiracies with only one defendant in common to both conspiracies because the transactions alleged in both were part of a series of acts that shared a common purpose of concealing and laundering the income of the common defendant).

In this case, there is substantial overlap among defendants in the charged crimes. For example, defendant Alicia Dimichele is charged with her husband Edward Garofalo in participating in the embezzlement of employee benefit funds, commonly known as double-breasting, through the operation of a non-union company, in violation of 18 U.S.C. § 664, as well as

the conspiracy to commit this crime.  Defendants Romeo and
Sciaretta are charged with the same wire fraud/ commercial
bribery scheme as co-defendants Persico, Persico, Jr., Petrizzo
and former co-defendant James Bombino.  Preza is charged with
financing a loan to principals of CJP Development (the double-
breasted counterpart of All Around Trucking) that is inextricably
intertwined with the loan for which Persico and Persico, Jr. are
charged with making an extortionate extension of credit.[3]
Indeed, the charging language of Count Eight charges Preza with
advancing $100,000 on behalf of Michael Persico with reasonable
grounds to believe that Persico intended to use that money for
the purpose of making an extortionate extension of credit.

        For each of these charges, there is a substantial
overlap of proof against each of the charged defendants.  For
example, both Garofalo and Dimichele are implicated by Title III

_____

    [3]    It is specious for Preza to claim that because Count
Eight references "CJP Development" rather than "All Around
Trucking," these are factually distinct crimes.  The government's
proof at trial will establish that the principals of All Around
Trucking and those controlling them intended CJP Development and
All Around to be double-breasted shops to enable them to continue
to engage in non-union work without paying union benefits.  In
addition, United States v. Friedman, 854 F.2d 535, 561 (2d Cir.
1988), cited by Preza, does not stand for the proposition that
the only fact this Court may examine in evaluating joinder is the
indictment.  Rather, the Friedman court simply noted that RICO
charges broaden the government's ability to charge multiple
defendants in the same case; thus, the court's analysis was
easily completed by examining whether a defendant moving for
severance was properly named in the RICO count even if he were
charged in crimes unrelated to the other defendants.

recordings and documents seized during the execution of a search warrant from their business and home.  The government would introduce the same proof of Persico's involvement in making extortionate extensions of credit in a trial against Preza to establish the elements of Count Eight.  Romeo and Sciaretta are implicated by the same consensual recordings implicating Bombino, Persico, Persico, Jr. and Petrizzo, which provide the full scope of the fraudulent scheme.  For each of these crimes, the government expects to introduce the testimony of CW-1 as well as the same corroborating evidence to establish the defendants' guilt.  This would be the same proof offered whether or not the non-RICO defendants were tried separately.  For these reasons, the Defendants were properly joined pursuant to Rule 8.

> 2.    There is Insufficient Risk of Spillover
>       Prejudice to Warrant Severance Under
>       Rule 14

Fed. R. Crim. P. 14 permits district courts to sever defendants' trials if it appears that a defendant is prejudiced by joinder of defendants for trial together.  The burden is on the defendant to show that the prejudice is sufficiently severe to outweigh the preference for joint trials of defendants indicted together and alleged to have participated in a common scheme.  See, e.g., Walker, 142 F.3d at 110.  In addition, the "decision whether to grant a severance . . . is 'committed to the sound discretion of the trial judge," and "the exercise of that

12

discretion is 'virtually unreviewable.'" United States v. Benitez, 920 F.2d 1080, 1085 (2d Cir. 1990) (internal citations omitted).

The non-RICO defendants argue that a joint trial will prejudice them through the spillover of evidence of the co-defendants' ties to the Colombo crime family, the fact that the RICO defendants are charged with extortion, a crime of violence, and the large volume of evidence that will be offered against the RICO defendants relative to the evidence offered against them. None of the non-RICO defendants has shown the substantial prejudice required for severance.

The likelihood of spillover prejudice is reduced when the evidence against each defendant is "straightforward" and unlikely to confuse the jury.  See, e.g., United States v. Hernandez, 85 F.3d 1023, 1029-1030 (2d Cir. 1996).  Here, the evidence against Romeo and Sciaretta is straightforward: it consists, in large part, of the testimony of a cooperating witness, consensual recordings, and corroborative testimony of civilian witnesses and documentary evidence.[4]  The same holds

---

[4]  Romeo incorrectly asserts that his charges are not interrelated to the other counts (Romeo Br. at 2).  To the contrary, this same crime is charged as Racketeering Act 7 and it is part of a series of crimes involving the Colombo family's control of All Around Trucking.  Romeo's citation to United States v. Lasanta, 978 F.2d 1300, 1308 (2d Cir. 1992), overruled on other grounds by Florida v. White, 526 U.S. 559 (1999), is also puzzling since there the Circuit affirmed the denial of a defendant's motion for severance where he was charged with a

true for Alicia Dimichele: the evidence against her largely consists of two cooperating witnesses' testimony, Title III interceptions, and documentary evidence.[5]  For Anthony Preza, the evidence consists primarily of the testimony of two cooperating witnesses, consensual recordings and bank records.  In addition, as discussed above, the government would offer the same evidence against Preza that it seeks to admit against Michael Persico, even if Preza were tried alone, in order to establish it was reasonable for Preza to believe Persico would use this money "for the purpose of making extortionate extensions of credit."[6]  (Sup.

---

cocaine distribution conspiracy while his co-defendants were charged with a heroin distribution conspiracy, bribery and gun possession for which there was voluminous evidence.

[5]     Dimichele asserts that a prosecution against her alone (or her and her husband alone) would not have been deemed complex.  That is incorrect.  Dimichele is implicated on two separate Title III wiretaps that lasted for two months.  In addition, voluminous documents were seized from her office and home.  If she were prosecuted with her husband, much of the evidence produced in discovery in this prosecution would have been produced to him, including the 829 consensual recordings by CW-1 and ten additional consensual recordings by a separate cooperating source, and the two Title III wiretaps referenced above.  In either case, the matter would have properly been deemed complex for Speedy Trial Act purposes.

[6]     Preza appears to believe that he cannot be found guilty under 18 U.S.C. § 893, which prohibits the financing of extortionate extensions of credit, if the government fails to prove the elements of subsection (b) of 18 U.S.C. § 892, which prohibits the making of extortionate extensions of credit.  See Preza Mem. at 6.  Section 892(b) provides that the government may make a prima facie showing that an extension of credit was extortionate by submitting proof concerning of certain characteristics of the loan, relating to its enforceability, interest rate, the amount of the loan and the debtor's reasonable

14

Ind't ¶ 69).  The number of recordings in which these Non-RICO defendants are captured relative to their co-defendants is also not prejudicial.  The Second Circuit has repeatedly rejected the argument that a defendant is prejudiced by being tried with co-defendants against whom the proof was stronger.  See, e.g., United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993); United States v. Scarpa, 13 F.2d 993, 1014-1015 (2d Cir. 1990); Cervone, 907 F.2d at 341-42.  Indeed, it is possible that such a trial will benefit the non-RICO defendants since the proof against them, in contrast to that against the RICO defendants, may appear to be less and their roles may appear to be less significant.  See Richardson, 481 U.S. at 210 ("Joint trials generally serve

---

beliefs about either the prior conduct or reputation of the creditor.  Preza's reliance on § 892(b) is misplaced.  First, Preza is charged with violating § 893, not § 892, and the prima facie provisions under § 892(b) have no application to the anti-financing statute.  Second, § 892(b) clearly states that "this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a)," which generally prohibits the making of, and conspiring to make, extortionate extensions of credit, without specific reference to the amount, interest rate and enforceability of the loan or the reasonable beliefs of the debtor.  As the Second Circuit has held, § 892(b) creates a "permissible inference or presumption."  United States v. Curcio, 712 F.2d 1532, 1540 (2d Cir. 1983).  Thus, assuming the government proves each of the elements of the prima facie case under § 892(b), then a jury may, but is not required to, see id., infer that the extension of credit was extortionate.  Thus, even assuming arguendo that § 892(b) were somehow relevant to the § 893 charge against Preza, the government would still not be required to introduce evidence concerning the amount, interest rate or enforceability of the loan, as Preza erroneously suggests.

the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit.").

While it is true that the RICO defendants are charged with additional crimes with which the non-RICO defendants are not charged, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." Scarpa, 913 F.2d at 1015 (quotation marks omitted).[7]  Nor does a defendant's relatively minor role require severance.  See United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988).  Moreover, a limiting instruction, which juries are presumed to follow, about

---

[7]     United States v. Bellomo, 954 F. Supp. 630, 649 (S.D.N.Y. 1997), cited by Sciaretta and Dimichele, is not persuasive here, for in that case, the government's estimate of the length of its case against 19 defendants was four to six months, an estimate vastly greater than applicable here. The district court in Bellomo followed the teachings of United States v. Casamento, 887 F.2d 1141, 1151-52 (2d Cir. 1989), which altered the preference for joint trials when the presentation of the government's case is estimated to last over four months where there are more than 10 defendants.  In such instances, the prosecution is required to provide a reasoned basis for its conclusion that a joint trial of greater than 10 defendants is more consistent with a fair administration of justice than a division of the case into smaller trial groups.  Neither circumstance is present here.  There are currently 8 defendants awaiting trial and the government's estimate of the length of its case is six weeks or less.  United States v. Maisonet, 1998 WL 355414 (S.D.N.Y. 1998) is also not controlling for it involved 19 defendants, including some charged with death-eligible murders, and one defendant, an attorney, who had previously represented several of his co-defendants, and the court believed the government's case would last for considerably longer than its two to three month estimate.

what evidence the jury may consider should cure any risk of prejudice. See, e.g., United States v. Jovner, 201 F.3d 61, 75 (2d Cir. 2000); United States v. Villegas, 899 F.2d 1324, 1347-48 (2d Cir. 1990); United States v. Teitler, 802 F.2d 606, 617 (2d Cir. 1986).

In sum, in light of the straightforward proof, the overlap of evidence and charges between the non-RICO defendants and the RICO defendants, and the ability of the Court to provide a proper instruction to the jury to consider the evidence separately against each defendant, no defendant can show the substantial prejudice necessary to warrant a separate trial.

### 3. Bruton v. United States also does not Warrant Severance

Defendants Petrizzo and Romeo seek severance on the ground that the admission of Sciaretta's post-arrest statements would unfairly incriminate them, in violation of their rights under the Confrontation Clause of the Sixth Amendment. This motion should be denied, because the proffered statements can be adequately redacted and admitted subject to limiting instructions consistent with Bruton v. United States, 391 U.S. 123 (1968), and Richardson v. Marsh, 481 U.S. 200 (1987).

### a. Applicable Law

Under Bruton, admission of a non-testifying co-defendant's confession violates the Confrontation Clause if the confession expressly names the defendant as a participant in

17

the crime, even if the jury is instructed to consider it only against the co-defendant.  See Bruton, 391 U.S. at 124-26, 135-37.  Bruton rested on the premise that a jury "cannot determine that a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore the inevitable conclusion that B has committed those same criminal acts with A."  Id. at 131.

In Richardson, the Supreme Court held that when a confession is redacted so that it does not facially incriminate the defendant, its admission with a proper limiting instruction does not violate the Confrontation Clause.  See Richardson, 481 U.S. at 208-09.  Under Richardson, whether the statement incriminates the defendant in the context of other evidence does not affect the analysis; indeed, the Court expressly foreclosed such an approach.  See id.

Consistent with Richardson, the Second Circuit has adhered closely to the Supreme Court's rejection of a contextual approach to determining whether a redacted confession violates the Confrontation Clause.  See, e.g., United States v. Jass, 569 F.3d 47, 61 (2d Cir. 2009); United States v. Lung Fong Chen, 393 F.3d 139, 150 (2d Cir. 2004).  Notably, in United States v. Williams, 936 F.2d 698, 700-01 (2d Cir. 1991), the Second Circuit explained that "[i]f the confession, [when viewed in isolation from other evidence introduced at trial], does not incriminate

18

the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant."[8] 936 F.2d at 700-01.  Indeed in Williams, the Second Circuit sanctioned the admission of such a redacted statement even where other evidence "all but insured that a jury could identify the person referred to in [the co-defendant's admission] as [the defendant challenging its admission]." Id. at 701 (emphasis in original).  See also United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989) ("[A] redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights.").

The Second Circuit has held that the admission of statements that satisfy Bruton also satisfy Crawford v. Washington, 541 U.S. 36 (2004):

> For Crawford to provide assistance to [defendants raising Bruton claims], [the non-testifying co-defendant]'s statements must have been admitted against

---

[8]   In Gray v. Maryland, 523 U.S. 185, 192 (1998), the Supreme Court made clear that it was not permissible to "obviously redact[]" a confession by replacing a defendant's name with "[DELETE]" or another symbol because such a statement "facially incriminat[ed]" the defendant and "involve[d] inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial."

> them.  As discussed above, [co-defendant]'s statements
> inculpate [them] only in the context of the substantial
> evidence used to link them to [co-defendant]'s
> statements.  The same attenuation of [co-defendant]'s
> statements from [their] guilt that prevents <u>Bruton</u>
> error also serves to prevent <u>Crawford</u> error.  Thus,
> there is no separate <u>Crawford</u> problem, and we see no
> indication that <u>Crawford</u> overrules <u>Richardson</u> or
> expands the holding of <u>Bruton</u>.

<u>Chen</u>, 393 F.3d at 150 (finding no Confrontation Clause violation

by admission of co-defendant's statement that allegedly

implicated entire board of which challenging defendants were a

part since those statements implicated other board members only

in conjunction with other evidence).

   b. <u>Analysis</u>

   Counsel for Sciaretta has indicated that his client

intends to testify.  If Sciaretta does so, there is no <u>Bruton</u>

issue since he will be available for cross-examination.

   Even assuming Sciaretta declines to testify, his post-

arrest statement may be redacted in such a way to satisfy <u>Bruton</u>

and its progeny.  Sciaretta's statements fall into 7 categories:

(1) statements about his background at Testa Corporation, (2)

statements about All Around Trucking's work for Testa

Corporation, (3) statements implicating himself in the fraud and

bribery scheme with which he was charged, (4) statements

implicating former co-defendant James Bombino in the fraud and

bribery scheme with which he had been jointly charged, (5)

statements implicating co-defendants Romeo and Petrizzo in the

fraud and bribery scheme with which they are jointly charged,(6) statements claiming that Steven Testa knew of the bribery scheme, and (7) statements supporting Sciaretta's stated view that Steven Testa was being extorted by Petrizzo.  Statements in categories (1), (2), (3), (4) and (6) do not run afoul of <u>Bruton</u> since none of those statements reference any co-defendant who is awaiting trial.  Sciaretta's remaining admissions may be redacted such that the names "Romeo" and "Petrizzo" are replaced with neutral pronouns with no indication that the original statements contained an actual name.  <u>See</u>, <u>e.g.</u>, <u>Jass</u>, 569 F.3d at 61, 62, 63 (citing cases approving of referring to co-defendant as "neighbor", "other guys" and affirming substitution of "another person" for appellant co-defendant); <u>Benitez</u>, 920 F.2d at 1087 (affirming substitution of "friend" for reference to co-defendant)  For example, Romeo may be referred to as "another guy" or the "other guy" and Petrizzo may be referred to as "another guy" or "a third party" to the extent a statement references both Romeo and Petrizzo.

> 4.   No Defendant Advances a Defense Sufficiently <u>Antagonistic to Warrant Severance</u>

Sciaretta and Dimichele claim, conclusorily, that at this stage it is possible that the defendants may have defenses antagonistic to another, although no defendant actually asserts a defense antagonistic to other defendants.  Despite these vague assertions, it appears that the defendants' interests align in

21

discrediting the government's witnesses and attempting to minimize or explain away evidence captured on consensual recordings or other sources. Since no defendant advances a defense that would be deemed antagonistic enough to warrant severance, this Court should not engage in speculation about the hypothetical existence of such a defense. See United States v. Richards, 94 F. Supp. 2d 304, 312 (E.D.N.Y. 2000)(Nickerson, J.)(severance denied based on claim of mutually antagonistic defense where "[d]efendants have done no more than speculate that there may be 'some antagonism' between their cross-examination and summations as to one witness"); United States v. Badr, 604 F. Supp. 569, 581 (E.D.N.Y. 1985)("Where a defendant fails to state the nature of his defense and in which respect, if any, his defense is inconsistent with or antagonistic to that of his co-defendant, there is no basis for severance.")(citing United States v. Pellon, 475 F. Supp. 467, 482 (S.D.N.Y. 1979), and United States v. Wheaton, 463 F. Supp. 1073, 1077 (S.D.N.Y. 1979)).[9]

---

[9]     Any risk of prejudice can fully be addressed through a limiting instruction by the Court, see Diaz, 176 F.3d at 104 (any prejudice stemming from antagonistic defense cured by court's limiting instruction), which juries are presumed to follow, see United States v. Teitler, 802 F.2d 606, 617 (2d Cir. 1986)(setting forth strong presumption that jurors can and will follow instructions to consider certain evidence separately); United States v. Urso, 369 F. Supp. 2d 254, 269 (E.D.N.Y. 2005)(Garaufis, J.)("[J]uries are strongly presumed to be capable of following a judge's instructions in sorting out what evidence bears on the guilt of any single defendant.")(citing Richardson,

A "mutually antagonistic defense" as defined by the Supreme Court and Second Circuit, requires more than mere antagonism between the defendants.  The Second Circuit has held that to prevail on a severance motion based on "mutually antagonistic defenses," a defendant must prove that as a result of his defense a "jury must of necessity convict a second defendant."  United States v. Yousef, 327 F.3d 56, 151 (2d Cir. 2003)(internal quotations and citations omitted); see also Zafiro, 506 U.S. at 542 (Stevens, J., concurring)(describing mutually antagonistic defenses as those as to which "acceptance of one . . . necessarily preclude[s] acceptance of the other and acquittal of the codefendant").

The facts of Zafiro are itself instructive.  In that case, each defendant blamed the other for the charged crime and each claimed to be the innocent victim of the other.  Yet the Supreme Court did not find this circumstance alone sufficient to merit severance, and instead held that the defendants failed to make a sufficient showing of prejudice.  The Supreme Court also noted that to the extent any prejudice did occur, it properly was cured by the district court's limiting instructions.  See id. at 540-541.

---

481 U.S. at 211, and Zafiro, 506 U.S. at 541).

In reaching its decision in <u>Zafiro</u>, the Supreme Court emphasized the "preference in the federal system for joint trials of defendants who are indicted together" and reiterated that "[j]oint trials 'play a vital role in the criminal justice system.'"  <u>Id</u>. at 537 (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 209 (1987)).  The Supreme Court also noted the "low rate of reversal" for a "failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses" crediting this low rate to "the inability of defendants to prove a risk of prejudice in most cases involving conflicting defenses."  <u>Id</u>. at 538.

A showing that defendants will mount inconsistent defenses, or that defendants dislike or even detest one another, does not necessarily form the basis of a "mutually antagonistic defense" sufficient to merit severance.  See <u>United States v. Blount</u>, 291 F.3d 201, 209 (2d Cir. 2002)("A trial need not be severed simply because codefendants raise conflicting defenses."); <u>United States v. Carpentier</u>, 689 F.2d 21, 27-28 (2d Cir. 1982) ("A simple showing of some antagonism between defendants' theories of defense does not require severance. '[T]he defense of a defendant reaches a level of antagonism (with respect to the defense of a co-defendant) that compels severance of that defendant, if the jury, in order to believe the core of testimony offered on behalf of that defendant, must necessarily

24

disbelieve the testimony offered on behalf of his co-defendant.'")(quoting United States v. Berkowitz, 662 F.2d 1127, 1134 (5th Cir. 1981)); Israel v. Riley, 1992 WL 100157, at *5 (E.D.N.Y. Apr. 21, 1992)("Severance is not required upon the mere showing of some antagonism between defendants' theories of defense.")(citing Grant v. Hoke, 921 F.2d 28, 31 (2d Cir. 1990)).[10]

     Accordingly, neither antagonism among codefendants nor inconsistent defenses trumps the strong preference in federal courts for joint trials.  See Bellomo, 263 F. Supp. 2d at 578. This strong preference has even greater force in racketeering prosecutions because at such trials joinder of multiple defendants is "particularly appropriate even if each defendant is

---

     [10]  Nor is the fact that one defendant has sought to harm another a sufficient basis to merit severance on a "mutually antagonistic defense theory."  See Diaz, 176 F.3d at 104 ("mere 'hostility' between [codefendants] does not warrant severance," nor does testimony that one defendant sought to kill codefendant).  Were it not so, there would arise significant complications in organized crime and gang prosecutions involving criminal enterprises that resolve internecine disputes through violence — thereby undermining the repeated holdings of courts in this Circuit that defendants charged in the same racketeering enterprise generally should be tried together, even if they are not involved in the same racketeering acts.  See, e.g., Nerlinger, 862 F.2d at 973 (upholding joint trial of defendants in RICO cases even where allegations as to each defendant were factually distinct, defendants had no direct contact with one another and defendants committed predicate acts during different periods).  More significantly, a holding that threats between codefendants automatically gives rise to severance would have the perverse effect of creating an incentive for defendants, in fact, to make such threats to benefit their preferred trial strategies.

charged with committing different predicate acts as part of the alleged pattern of racketeering activity." United States v. Triumph Capital Group, Inc., 260 F. Supp. 2d 432, 438 (D. Conn. 2002).

Should the Court consider entertaining the requested severance on the basis of mutually antagonistic defenses, the defendants should at least be required to set forth in detail the evidence supporting their antagonistic theories. See United States v. Salameh, 152 F.3d 88, 116 (2d Cir. 1998) ("In order to make a showing of mutually antagonistic or irreconcilable defenses, the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of [the] other.") (internal quotation marks omitted). The bare claim that antagonistic defenses may exist is far from sufficient to overcome the presumption in favor of joinder. Moreover, any assertion of an antagonistic defense requires a good faith basis for its existence. See United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992) (cross-examination was not proper with respect to witness's alleged participation in murder because defense counsel lacked evidence either that the murder had occurred or that it was committed by the witness); United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir. 1983) (Though "counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to

anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts."); see also Watson v. Artuz, 99 Civ 1364 (SAS) 1999 WL 1075973, at *3 (S.D.N.Y. Nov. 30, 1999) (noting that "[c]ross-examination is not proper where there is an insufficient basis to support a conclusion that the acts alleged by the defendant in fact occurred, or when allegations are based largely on 'hearsay statements made by unidentified sources'") (citations omitted).

For the reasons stated above, the Court should deny the defendants' severance motions.

B.   The Motion To Dismiss Count Six Is Without Merit

Defendant Michael Persico seeks dismissal of Count Six as unconstitutionally vague, both on its face and as pled in the superseding indictment.  Specifically, Persico contends that dismissal is warranted because (1) the phrase "business of lending money" contained in 18 U.S.C. § 1961(6)(B) is impermissibly vague on its face, in that its meaning is insufficiently clear to define the conduct it prohibits and to prevent arbitrary enforcement, Persico Br. at 15-21; and (2) Count Six of the indictment is impermissibly vague as pled, in that it lacks sufficient factual detail to apprise the defendant of the specific offense with which he is charged.  See Persico

27

Br. at 21-24.  For the reasons set forth below, the defendant's arguments for dismissal of Count Six are without merit.

      1.    The Phrase "Business of Lending Money" Contained in 18 U.S.C. § 1961(6) is not Unconstitutionally Vague

Count Six charges a collection of unlawful debt conspiracy as follows:

> In or about and between May 2009 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL J. PERSICO and THEODORE N. PERSICO, Jr., also known as "Skinny" and "Teddy," together with others, being persons employed by and associated with the Colombo crime family, an enterprise that is engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through the collection of unlawful debt, as that term is defined in Title 18, United States Code, Section 1961(6), to wit: a debt that was unenforceable under New York State law, in whole and in part as to principal and interest because of the law relating to usury, and was incurred in connection with the business of lending money and one or more things of value at a rate usurious under New York State law, where the usurious rate was at least twice the enforceable rate.

Sup. Ind't ¶ 65.

Under 18 U.S.C. s 1961(6), an "unlawful debt" is defined to include, <u>inter</u> <u>alia</u>,

> "a debt . . . which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."

Persico contends that the phrase "business of lending money" in this provision of the RICO statute is so vague as to offend the Due Process Clause of the Fifth Amendment. Specifically, Persico contends that the phrase is "conspicuously undefined, by reference to any body of law or otherwise," Persico Br. at 16, and "giv[es] no inkling of what it means," <u>id</u>., making it "impossible for ordinary people to conform their behavior to the law." <u>Id</u>. at 17. These arguments are unavailing.

A penal statute, such as the provision of the RICO statute making it unlawful to conduct the affairs of an "enterprise," as that term is defined under 18 U.S.C. § 1961(4), through the collection of an unlawful debt, is void for vagueness if it does not define the criminal offense with sufficient clarity to allow ordinary people to understand what conduct is prohibited or if the statute is sufficiently indefinite to allow arbitrary or discriminatory law enforcement. <u>See</u> <u>Skilling v. United States</u>, 130 S.Ct. 2896, 2927-28 (2010) (citing <u>Kolender v.</u>

29

Lawson, 461 U.S. 352, 357 (1983)).  Phrased differently, "[t]he constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."  United States v. Harriss, 347 U.S. 612, 617 (1954).  "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."  Id.

"Claims of facial invalidity are generally limited to statutes that threaten First Amendment interests."  Arriaga v. Mukasey, 521 F.3d 219, 223 (2d Cir. 2008) (internal citation omitted).  The Second Circuit has "repeatedly held that when . . . interpretation of a statute does not implicate First Amendment rights," then "it is assessed for vagueness only 'as applied,' i.e., 'in light of the specific facts of the case at hand and not with regard to the statute's facial validity.'"  United States v. Rybicki, 354 F.3d 124,129 (2d Cir. 2003) (en banc) (quoting United States v. Nadi, 996 F.2d 548, 550 (2d Cir. 1993)).  Because no First Amendment rights are implicated here, Persico's challenge is evaluated on an "as applied" basis.[11]

---

[11]    The Supreme Court has stated in a plurality opinion that a facial challenge may be appropriate outside of the First Amendment context "[w]hen vagueness permeates the text."  City of Chicago v. Morales, 527 U.S. 41, 55 (1999); but see Rybicki, 354 F.3d at 131 (declining to follow the statement in Morales because

In evaluating an as-applied vagueness challenge, the
Second Circuit has instructed courts to inquire whether the
challenged statute, on its face, provides sufficient notice to
alert "ordinary people [as to] what conduct is prohibited."
Arriaga v. Mukasey, 521 F.3d 219, 224 (2d Cir. 2008). "Statutes
need not . . . achieve 'meticulous specificity,' which would come
at the cost of 'flexibility and reasonable breadth.'" Id.
(quoting Grayned, 408 U.S. at 110). "'The test is whether the
language conveys sufficiently definite warning as to the
proscribed conduct when measured against common understanding and
practices.'" Id. (quoting Jordan v. De George, 341 U.S. 223, 231
(1951)).

On its face, the meaning of the phrase "business of
lending money" contained in 1961(6) is far from impermissibly
vague. To the contrary, the phrase "communicates its reach in
words of common understanding." Boos v. Barry, 485 U.S. 312, 332
(1988). The words "business," "lending" and "money" are among
the most widely used and understood words in the English
language. Accordingly, "[t]he likelihood that anyone would not

---

it did not command a majority). However, even assuming a facial
challenge is permitted outside of the First Amendment context,
"the identified test is . . . only a variation of as-applied
analysis, requiring the defendant to show 'that the law is
impermissibly vague in all of its applications.'" United States
v. Farhane, 634 F.3d 127, 139 (2d Cir. 2011) (quoting Village of
Hoffman Estates v. Flipside Hoffman Estates, Inc., 455 U.S. 489,
497 (1982)).

understand any of those common words seems quite remote." <u>Hill</u>
<u>v. Colorado</u>, 530 U.S. 703, 732 (2000).  Indeed, the Supreme Court
previously denied a vagueness challenge premised on the alleged
ambiguity of similarly commonplace commercial terms, reasoning
that the meaning of such terms is widely understood.  <u>See</u> <u>Ohio ex</u>
<u>rel. Lloyd v. Dollison</u>, 194 U.S. 445, 450 (1904) (upholding
constitutionality of Ohio statute allowing municipalities to
prohibit alcohol sales except among manufacturers selling
"wholesale quantities to any party residing outside of the limits
of said municipality," noting, "[w]holesale and retail are pretty
well known terms").

          Nor does Persico's "cascade of questions," Persico Br.
at 16, call into doubt the facial validity of the statute.  The
questions suggest that a potentially broad range of activity is
covered by the phrase "business of lending money."  This
conclusion comports with common sense; most people of ordinary
intelligence would recognize many different individuals or
businesses, making different types of loans to a wide variety of
individual and corporate borrowers, as being in the "business of
lending money."  It is a hallmark of such phrases that, although
widely understood, they are incapable of precise definition.  As
the Supreme Court has recognized, such imprecision is inherent in
the nature of language and is not to be equated with
unconstitutional vagueness.  <u>See</u> <u>Grayned v. City of Rockford</u>, 408

U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language.").[10]

Persico argues that the vagueness of the phrase "business of lending money" is further demonstrated by the allegedly greater precision of the phrase "business of gambling," which is also contained 1961(6).  Even assuming, arguendo, that the phrase "business of gambling" is more precisely defined that the phrase "business of lending money," such greater precision would not strengthen Persico's vagueness claim.  Because the meaning of "business of lending money" provides fair notice to persons of ordinary intelligence concerning what constitutes prohibited conduct, it is not relevant that other words or phrases in the same statute are more precisely defined.  The Due Process inquiry with respect to the phrase "business of lending money" ends with the conclusion that persons of ordinary intelligence are capable of understanding it.

There is also no merit to Persico's contention that the "sparse and unenlightening case law" contributes to the ambiguity

---

[10]    On the other hand, if the point of Persico's "cascade of questions" is to raise the purely theoretical possibility that, under some hypothetical set of circumstances the phrase "business of lending money" might be ambiguous, the Supreme Court has rejected such exercises as irrelevant to the vagueness inquiry.  See Hill v. Colorado, 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'") (quoting United States v. Raines, 362 U.S. 17, 23 (1960)).

of the phrase "business of lending money."  In <u>Durante Bros. and
Sons, Inc. v. Flushing Nat'l Bank</u>, 755 F.2d 239, 250 (2d Cir.
1985), the Second Circuit cited to the legislative history of
RICO, which clearly indicates that the "business of lending
money" requirement was included to ensure "the exclusion from the
scope of the statute of occasional usurious transactions by one
not in the business of loan sharking."  Examining the same
provision, the district courts in <u>Weisel v. Pischel</u>, 197 F.R.D.
231, 241 (E.D.N.Y. 2000), and <u>Robidoux v. Conti</u>, 741 F.Supp.
1019, 1022 (D.R.I. 1990), reached the same conclusion as the
Second Circuit in <u>Durante Bros.</u> concerning the intent of Congress
with respect to the phrase "business of lending money."[11]

 With respect to the second prong of the as-applied
analysis, which concerns the potential for arbitrary enforcement,
a statute will not be found void for vagueness on an as-applied

---

[11] Persico erroneously asserts that the conclusion reached
in <u>Durante Bros.</u>, <u>Weisel</u> and <u>Robidoux</u> is contradicted by <u>Middle
States Knowlton Corporation v. Esic Capital</u>, Inc., 1985 WL 7441
(D.D.C. 1985), in which the court rejected the defendant's
argument that a single loan cannot constitute a business within
the meaning of the phrase "business of lending money" under §
1961(6)(B).  The court in <u>Middle States</u> emphasized the ongoing,
continuous nature of the activity relating to the loan
transaction at issue: "The loan . . . involved extensive activity
over a substantial period of time and constituted a substantial
portion of the activities of [the defendant]."  1985 WL 7441, at
*8.  This finding is consistent with the conclusion in <u>Durante
Bros.</u>, <u>Weisel</u> and <u>Robidoux</u> that the phrase "business of lending
money" was intended by Congress to exclude isolated usurious
lending activities from the reach of the collection of unlawful
debt prong of the RICO statute.

basis so long as "the conduct at issue falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute."  Farrell v. Burke, 449 F.3d 470, 494 (2d Cir. 2006).  The government's proof at trial will show that Persico, together with others, conspired to collect a debt incurred by James C. Bombino and Steven Marcus, principals of All Around Trucking, in the principal amount of $100,000.00, carrying an interest rate of sixty percent per year. The evidence will also show that Persico was in the business of lending money, in that he more than occasionally lent money in the expectation of repayment at a profit, at least in some cases to individuals who understood that they would suffer physical harm if the loans were not repaid in a manner satisfactory to Persico.  On these facts, there can be no doubt that the conduct at issue "falls squarely within the statute's prohibition." Burke, 449 F.3d at 494; see also United States v. Farhane, 634 F.3d 127, 141 (2d Cir. 2011) (holding that, because the defendant's conduct "fell so squarely with the core of [the statute's] prohibition, the application of that law to his conduct cannot have been the product of arbitrary law enforcement.")

35

For these reasons, Persico's motion to dismiss Count Six of the superseding indictment on the ground that the phrase "business of lending money" contained in 18 U.S.C. § 1961(6)(B) is unconstitutionally vague on its face is without merit.

### 2.   Count Six is not Impermissibly Vague as Pled in the Superseding Indictment

The Supreme Court has held that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974).  Thus, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975).  Furthermore, "an indictment need not set forth evidence or details of how the alleged crime was committed." United States v. Carr, 582 F.2d 242, 244 (2d Cir. 1978); see also United States v. Bernstein, 53 F.2d 775, 786 (2d Cir. 1976).  Count Six of the indictment, as pled, meets all of these requirements.  Together with the summary in the foregoing section of the government's anticipated proof at trial relating to the debt – concerning the persons from whom Persico conspired with others to collect the debt, the principal amount of the loan, the interest rate, and what the government

36

anticipates the proof will show with regard to Persico's having been in the business of lending money — Count Six of the Indictment provides sufficient notice to the defendant of the specifics of the charge against him.

C.   The Defendants' Discovery Demands Are Without Merit or Premature

Michael Persico, Anthony Preza, Thomas Petrizzo, Theodore Perisco, Jr. and Louis Romeo[12] argue that the government should be required to immediately provide: (1) the recordings and other exhibits that the government intends to use at trial; (2) any draft transcripts that have been prepared of recordings the government intends to use at trial; (3) a list of recordings on which the defendants, though not overheard speaking are referenced by other individuals; and (4) any Brady or Giglio information, including statements made by victims of the defendants' crimes.

1.   Trial Exhibits and Transcripts

Michael Persico, Anthony Preza, Thomas Petrizzo, Theodore Persico, Jr. and Louis Romeo demand immediate disclosure of the government's trial exhibits.  This request is unwarranted. None of the cases cited by the defendants required the government to identify trial exhibits more than eight weeks before trial. Indeed, the majority of the decisions required the government to

---

[12]   Persico, Jr. and Romeo join in the other defendants' motions to the extent applicable to them.

37

provide a <u>preliminary</u> exhibit list 30 days or less in advance of
trial.  As the court acknowledged in <u>United States v. McDade</u>, the
government is not required to set forth its trial plans three
months before trial. <u>United States v. McDade</u>, No. Cr. A. 92-249,
1992 WL 382351, at * 2 (E.D.Pa. Dec. 11, 1992).

        In cases involving voluminous discovery, courts have
required the government to disclose its exhibit list between
seven days and 60 days before trial.  <u>See</u>, <u>e.g.</u>, <u>United States v.</u>
<u>Falkowitz</u>, 214 F. Supp. 2d 365, 393 (S.D.N.Y. 2002) (requiring,
in a complex life insurance fraud scheme, that the government
provide a "working copy of its exhibit list" one week prior to
trial); <u>United States v. Vasquez</u>, 258 F.R.D. 68, 76 (E.D.N.Y.
2006) (requiring government to identify documents it intended to
use at trial 30 days in advance of trial); <u>United States v.</u>
<u>Vilar</u>, 530 F. Supp. 2d 616, 640 (S.D.N.Y. 2008) (requiring
exhibit list 60 days prior to commencement of trial in a case
where the defendants sought to challenge certain evidence as
"tainted" prior to trial); <u>United States v. Chalmers</u>, 474 F.
Supp. 2d 555, 572-573 (S.D.N.Y. 2007) (when a large volume of
documents, many of them in Arabic, were provided in discovery,
the government was required to turn over a preliminary exhibit
list 30 days before trial and final list 10 days before trial,
and the defendants required to do the same); <u>United States v.</u>
<u>Giffen</u>, 379 F. Supp. 2d 337, 344 (S.D.N.Y. 2004) (requiring the

government and the defense to produce their exhibit lists 30 days before trial); United States v. McDonald, No. 01 Cr. 1168, 2002 WL 2022215, at * 3 (E.D.N.Y. Aug. 6, 2002) (requiring the government to provide an exhibit list eight weeks before trial).

Courts that require the government to provide an exhibit list in advance of trial have also recognized that the exhibit lists are preliminary.  Therefore, the government is permitted to supplement with additional exhibits.  See, e.g., Falkowitz, 214 F. Supp. 2d at 639 (describing the government's exhibit list as a "working" list);  United States v. Turkish, 458 F. Supp. 874, 882 (S.D.N.Y. 1978); Chalmers, 474 F. Supp. 2d at 572-573; United States v. Poindexter, 727 F. Supp. 1470 (D.D.C. 1989)(requiring the government to identify, within 30 days of the court's order, the documents it intended to rely on at trial, but permitting the government to identify a reasonable number of additional documents at a later date).

While this case does involve a substantial volume of recordings, it does not involve the level of intricacy described in cases such as Falkowitz and Chalmers.  Therefore, the government proposes the following discovery schedule.  Thirty days prior to trial, the government will identify for the defense the recordings which the government does not plan to use at trial.  See, e.g., United States v. McDade, 1992 WL 382351, at *2.  Two weeks prior to trial, the government will provide a

39

preliminary list of the recordings that it does intend to use at trial.  Although the government will use its best efforts to ensure that this list is complete, the government requests permission to supplement that list if it determines that additional recordings are necessary for trial.[13]  The government also respectfully requests that the defendants be required to provide their preliminary exhibits lists 30 days before trial as well. See, e.g., Giffen, 379 F. Supp. 2d at 344; Chalmers, 474 F. Supp. 2d at 572-573.

      2.    Identification of Recordings on Which Defendants Are Referenced

The defendants have demanded that the government identify recordings in which the defendants, though not participants in the recorded conversations, are referenced by the participants in the recorded conversations.  The government has provided the defendants with many of the recordings in this case over one year in advance of trial, together with a list of the dates of the recordings of conversations on which each of the defendants participated, and is not obligated pursuant to Rule 16 to identify each recording on which the defendant is referenced. The government respectfully submits that the proposal described

---

[13]     With respect to transcripts, the government will provide the defense with transcripts as they become available. The government has already provided several draft transcripts, and will provide draft transcripts of a large portion of the remaining recordings at the end of the month.

above will provide the defendants with ample notice of the recordings the government intends to use at trial.  To the extent the defendants believe that other recordings are helpful in preparing their defense, they have had ample opportunity to review them.

### 3.  Brady / Giglio Demands

The defense moves for disclosure of material under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).  The government has to date disclosed Brady material and will continue to do so.  Further, the government is aware of its obligations under Brady and will continue to meet them.  The defendants' request for immediate disclosure of Giglio information should be denied, especially in light of the risk of witness tampering and intimidation in this case.

### a.  The Defendants' Demand for Giglio Material Is Premature

Although the defendants have not specifically characterized the Giglio information they seek, it appears that they are requesting early disclosure of material that is discoverable pursuant to 18 U.S.C. § 3500.  As a general rule, defendants in criminal cases have no pretrial right to such information.  The defendants' attempt to obtain such impeachment material at this time is premature.  As Judge Johnson has noted:

> Evidence which is not exculpatory, but is
> relevant for the purposes of impeachment,
> must be produced to the  defense, but need
> not be turned over in advance of trial. . . .
> The government may wait until a witness has
> testified before disclosure of such material
> is mandated.  Typical impeachment material,
> such as the witness's beneficial treatment by
> the government, is normally disclosed at the
> time the 3500 material is turned over – after
> the government's witness has testified on
> direct.  Therefore, Defendant's request that
> this Court direct the Government to
> immediately provide such material is denied.

United States v. Hotte, No. 97 CR 669 (SJ), 1997 WL 694718, at *2

(E.D.N.Y. Nov. 6, 1997)(internal citations omitted)(citing United

States v. Nixon, 418 U.S. 683, 701 (1974);  United States v.

Payden, 613 F. Supp. 800, 821-22 (S.D.N.Y. 1963); and 18 U.S.C. §

3500(b)).

> b.    Early Disclosure of Giglio Material Risks
>       Witness Intimidation

The defendants have not asserted how earlier pretrial

disclosure of any impeachment information is necessary to the

preparation of the defense.  At a minimum, defendants should be

required to articulate how their purported need for impeachment

material regarding the government's witnesses outweighs the very

real risk inherent in disclosing the identity of the witnesses

and exposing them and their families to the dangers of harassment

and intimidation.  See United States v. Canty, 971 F. Supp. 687,

42

693 (N.D.N.Y. 1997)(defendants cannot compel disclosure of informant's identity on the basis of "bald statements" and mere speculation).

Indeed, there is a real risk of obstruction and witness intimidation in this case as demonstrated by the following examples.  First, prior to his arrest in this case, Theodore Persico, Jr. advised his co-conspirators, in contemplation of a future arrest, that he planned to "go out in a blaze," referring to killing people suspected of cooperating.  Thus, on January 23, 2010, James Bombino advised CW-1, in a conversation that was consensually recorded, that "Teddy told him to give him a list because, before Teddy goes, he is going to take care of everybody.  Teddy said to give him the list of drivers with big mouths, give him this, give him that, there is no doubt he is going out in a blaze."  Second, Persico, Jr. was involved in obstruction of justice following his arrest in 2005 on racketeering and extortion charges.  In that case, Patrick Bombino (the brother of co-defendant James Bombino), as a private investigator, made contact with one of the victims in the case.  Bombino asked the victim of an extortionate collection of credit to sign an affidavit on Persico, Jr.'s behalf stating that none of the defendants in that case had threatened him, which was then used in support of Persico, Jr.'s bail application.  Third, after Persico Jr.'s conviction in 1988 for his involvement in drug

43

trafficking, he conspired to murder of one of the key witnesses against him.  Finally, after Garofalo assaulted a truck driver who had blown his horn at Garofalo, Garofalo visited the victim's boss and instructed him to threaten the victim in order to ensure that the driver did not report the assault to law enforcement.[14]

      c.    The Government Will Comply With Its Obligations Pursuant to <u>Giglio</u> and 18 U.S.C. § 3500

Although <u>Giglio</u> information may be provided after the government's witness has testified on direct, courts have also held that <u>Giglio</u> material must be provided with sufficient time for it to be useful to the defense.  However, this principle does not require the government to provide <u>Giglio</u> material two or three months in advance of trial.  <u>See</u>, <u>e.g.</u>, <u>United States v. Underwood</u>, 04 CR 424 (RWS), 2005 WL 927012 at * 3 (S.D.N.Y. April 21, 2005) (citing cases)(requiring the government to make its <u>Brady</u> and <u>Giglio</u> disclosures on the Wednesday before trial was

---

[14]    In addition to the instances of witness intimidation specific to these defendants, the history of the Colombo Crime Family's interference with the judicial process and the past attempts by Colombo members and associates to obstruct justice further demonstrates the risk inherent in identifying the government's witnesses too early.  Colombo Crime Family members and associates have a well-documented history of obstructive conduct.  For example, former Colombo family street boss Thomas Gioeli and captain Michael Catapano engaged in a conspiracy to tamper with a witness who sought to cooperate against a potential confederate of the Colombo family, and former Underboss John "Sonny" Franzese admitted to a cooperating witness that he had previously engaged in the destruction of evidence at the behest of other members of the Colombo family, including members of the Persico family.

scheduled to begin in order to ensure that the defense had sufficient time to make use of the information).

Thus, in keeping with these principles and in an effort to avoid any adjournments or delay at trial which might occur if Giglio material is not produced until after the government's witnesses have testified at trial, the government will produce 3500 material for each witness approximately one week in advance of each witnesses' testimony, except with respect to those witnesses for whom the government has security concerns as a result of ths history of intimidation described above.   See United States v. Earls, 03 CR 364 (NRB) 2004 WL 350725, at *8 (S.D.N.Y. Feb. 25, 2004)(defendant's Giglio motion denied because the government has stated that it will produce Giglio material with its Jencks material no later than the "Friday of the week before a witness is expected to testify"); United States v. Perez, 940 F. Supp. 540, 553 (S.D.N.Y. 1996)("Following the usual practice in [the Southern] District, the government has agreed to make impeachment information available to the defense at the same time as Jencks Act material, i.e., 'one day prior to the day the witness is called to testify on direct examination,' or, if additional time is reasonably required to review such material, sufficiently in advance of the witness' testimony so as to avoid any delay at trial.  This practice will allow defense counsel

adequate time to prepare for cross-examination of government witnesses as they testify at trial.")(internal citations omitted).[15]

In addition, except with respect to those witnesses for whom the government has security concerns as a result of the history of witness intimidation described above, approximately three weeks prior to trial, the government will produce a letter outlining the categories of criminal activities in which the government's cooperating witnesses have engaged, as well as an account of any funds paid to the witnesses or expended on them or their families.

### 4.   404(b) and Impeachment Evidence

With respect to evidence the government seeks to admit pursuant to Federal Rule of Evidence 404(b), Michael Persico requests notice by July 1, 2011.  Anthony Preza further seeks: (1) to preclude the government from cross-examining Preza or any other defense witness called by Preza regarding Preza's uncharged

---

[15]   Prior to the disclosure of any materials pursuant to 18 U.S.C. § 3500, the government will request an Order from the Court: (1) precluding the distribution of any disclosed 3500 material to any individual outside of the trial defendants, trial counsel and their paralegals or other legal staff, and (2) requiring that all 3500 material be returned to the government within forty-eight hours after the completion of trial in this matter.

bad acts and (2) a hearing to determine whether uncharged bad acts the government seeks to introduce are admissible under either Fed. R. Evid. 608(a) or 404(b).

a.   Timing for Disclosure of 404(b) Evidence

Federal Rule of Evidence 404(b) requires the prosecution, upon the defendant's request, to "provide reasonable notice in advance of trial. . . .of the general nature of any such evidence it intends to introduce at trial."  Courts in the Second Circuit have repeatedly interpreted the "reasonable notice in advance of trial" requirement of Rule 404(b) to require disclosure two weeks prior to trial.  See, e.g., United States v. Ogando, 08 CR 1036(DAB), 2009 WL 4927541, at * 3 (S.D.N.Y. Dec. 16, 2009) (requiring disclosure 10 working days before trial); United States v. James, 02 CR 0778(SJ), 2007 WL 914242, at * 8 (E.D.N.Y. March 21, 2007); United States v. Heredia, 2003 WL 21524008, at *10 (S.D.N.Y. July 3, 2003)("It has been the practice of courts in this circuit to deem notice afforded more than ten working days before trial as 'reasonable' within the meaning of Rule 404(b)"); United States v. Silberstein, 02 CR 800 (SWK), 2003 WL 21488024, at *7 (S.D.N.Y. June 27, 2003)(government to provide notice of its Rule 404(b) evidence no later than two weeks prior to the commencement of the trial in this matter); United States v. Kelly, 99 CR 422 (RWS), 2000 WL 145468, at *3 (S.D.N.Y. Feb. 8, 2000)(same); United States v.

47

Tochelmann, 98 CR 1276 (JFK), 1999 WL 294992, at *4 (S.D.N.Y. May 11, 1999)(same).  The defendants' request for immediate disclosure of the government's Rule 404(b) evidence is thus unreasonable.  However, the government will advise the defendants' of the evidence it intends to introduce pursuant to Rule 404(b) three weeks before trial is scheduled to begin.

        b.    <u>Impeachment</u>

      Anthony Preza's motion to preclude the government from impeaching his testimony, should he testify, or the testimony of other witnesses who testify on his behalf, through questioning about Preza's uncharged bad acts is without merit.  Federal Rule of Evidence 608(b) precludes the use of <u>extrinsic</u> evidence to prove specific instances of the witnesses' conduct, unless, among other things, the prior conduct involves a criminal conviction meeting the requirements set forth in Fed. R. Evid. 609, is admissible under Fed. R. Evid. 404(b), or is probative of bias.  <u>See</u>, <u>e.g.</u>, <u>United States v. Schwab</u>, 886 F.2d 509, 511 (S.D.N.Y. 1989).  However, the rules of evidence do not preclude cross-examination of the defendant, or any other witness, regarding uncharged bad acts, if those acts are probative of truthfulness or untruthfulness.  Although such acts cannot be proven through extrinsic evidence (unless they prove bias or meet the

requirements of Rules 609 or 404(b)), they are acceptable areas for cross-examination if they are probative of truthfulness or untruthfulness.

Essentially, Preza seeks an advisory opinion regarding the scope of the government's cross-examination of defense witnesses.  Such a ruling would be premature at this time, as it is not possible to predict which subject areas might relate to the witnesses' truthfulness or untruthfulness.  See United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969)(holding that the district court had acted within its discretion in refusing to provide an advisory opinion regarding the proper scope of cross-examination); Brazeau v. Zon, 04 CV 031, 2007 WL 2903617, at * 36 (W.D.N.Y. Oct. 1, 2007) (holding that trial court did not err by refusing to issue an anticipatory ruling, prior to the defendant's testimony, regarding the admissibility of impeachment evidence on cross-examination).  The following hypothetical helps illustrate why an advisory opinion is inappropriate in advance of the witnesses' testimony:  Suppose Preza or another defense witness testifies that Preza was never associated with individuals involved in organized crime.  Cross-examination regarding Preza's participation in activities with other organized crime members and associates would be admissible to refute that testimony, even if such acts would not independently be probative of the witnesses' character for truthfulness.

c.  <u>Preza's Request for a Hearing</u>

Preza's request for a hearing regarding Rule 404(b) and Rule 609 evidence is premature at this time.  As noted, the government will provide the defendants with ample notice of its intent to introduce extrinsic evidence regarding uncharged bad acts, pursuant to Fed. R. Evid. 404(b).

Moreover, Preza's request that a hearing be held with respect to all uncharged conduct about which the government might question Preza during cross-examination is overly broad.  As discussed above in Section C(4)(b), Preza's motion ignores that Rule 608(b) specifically permits cross-examination regarding uncharged conduct as long as the uncharged acts are probative of truthfulness or untruthfulness of the witness.  While the government is required to provide advanced notice of its intent to introduce extrinsic evidence pursuant to Fed. R. Evid. 404(b), the government should not be required to preview, at a hearing or otherwise, all the impeachment material that it intends to use on cross-examination.  Indeed, it would be difficult, if not impossible, for the government to predict the scope of its cross-examination prior to: (1) knowing who the defense witnesses are and (2) hearing the witnesses' direct testimony.  <u>See</u> <u>United States v. Kahn</u>, 472 F.2d 272, 282 (2d Cir. 1973) (upholding the district court's denial of a pretrial hearing to address the scope of the government's cross-examination of the defendant and

50

noting, "the trial court's power to limit cross-examination is often best exercised after hearing the direct testimony of the witnesses").

III. <u>CONCLUSION</u>

       For the reasons stated above, the government respectfully requests that the defendants' motions for severance and for dismissal of Count Six of the Superseding Indictment be denied.  The government further requests that the defendants' discovery motions be denied, except, as indicated above, the Government will continue to comply with its discovery obligations, including its obligations pursuant to <u>Brady</u>, <u>Giglio</u>, 18 U.S.C. § 3500 and Fed. R. Evid. 404(b).  The government also reserves the right to make additional motions to the extent necessary.

                Respectfully submitted,

                LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York

Amy Busa
Michael Tremonte
Rachel Nash
Assistant U.S. Attorneys
    (Of Counsel)