TM:NMA/RJN/AL
F.#2009R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    10 CR 147 (S-4)(SLT)

    - against -

FRANCIS GUERRA, <u>et</u> <u>al.</u>,

         Defendants.

- - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTION IN LIMINE TO ADMIT CERTAIN
<u>EVIDENCE AGAINST THE DEFENDANTS AT TRIAL</u>

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

NICOLE ARGENTIERI
RACHEL NASH
ALLON LIFSHITZ
Assistant United States Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion in limine to admit at trial evidence of certain acts by the defendants Francis Guerra ("Guerra"), Michael Persico ("Persico") and Theodore Persico, Jr. ("Persico, Jr."). As demonstrated below, these acts constitute evidence of the charged racketeering conspiracy and of necessary background, or, in the alternative, are admissible pursuant to Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"). For the reasons set forth below, the Court should grant the government's motion.[1]

STATEMENT OF FACTS

I.    The Racketeering Enterprise

Guerra, Persico and Persico, Jr., have longstanding relationships with the Colombo organized crime family of La Cosa Nostra (the "Colombo family"). The fourth superseding indictment ("Indictment" or "Ind.") alleges that the Colombo family operated through various "crews," which consisted of Colombo family members (sometimes referred to as "soldiers") and associates. (Ind. ¶ 5.) Each crew was headed by a "captain," who in turn reported to the family hierarchy, including the "boss," who was assisted by an "underboss" and a "consigliere" in supervising and protecting the family's overall activities. (Id. ¶¶ 4-5.)

---

[1]    The government may seek to supplement this notice with additional "other acts" evidence.

1

Together, the boss, underboss and consigliere were the crime family's "administration."  (Id. ¶ 4.)

The principal purpose of the Colombo family was to generate money for its members and associates through a wide range of criminal activities, including drug trafficking, robbery, extortion, fraud, bribery, embezzlement, illegal gambling and loansharking.  (Id. ¶ 8.)  To further these criminal moneymaking activities, Colombo family members and associates engaged in additional crimes, some involving the use and threatened use of physical violence, including murder.  (Id.)  In addition, members and associates of the Colombo family at times used the resources of the Colombo family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the Colombo family.  (Id. ¶ 9.)  "For those purposes, members and associates of the [Colombo family] were asked and expected to carry out, among other crimes, acts of violence, including murder and assault."  (Id.)

The Indictment further alleges that "[t]he members and associates of the Colombo family engaged in conduct designed to prevent government detection of . . . their illegal activities." (Id. ¶ 10.)  This conduct included "a commitment to murdering persons, particularly members or associates of organized crime families, who were perceived as potential witnesses against members and associates of the enterprise."  (Id.)

II.  <u>The Defendants and Racketeering Acts</u>

Guerra, Persico and Persico, Jr., are all charged in Count One of the Indictment with racketeering conspiracy.  In particular, the Indictment charges that from approximately January 1987 to June 2011, these defendants and others were employed by or associated with the Colombo family and "conspire[d] to . . . conduct and participate, directly and indirectly, in the conduct of the affairs of [the Colombo family] through a pattern of racketeering activity[.]"  (Ind. ¶ 16.)

At all times relevant to the Indictment, Guerra and Persico were associates in the Colombo family.  Guerra was scheduled to be inducted into the Colombo family in December 2010, but the induction ceremony was canceled after the Colombo family came to believe the ceremony was the subject of law enforcement surveillance.  Persico is the son of Carmine "The Snake" Persico, the official boss of the Colombo family. Persico, Jr., was a high-ranking captain in the Colombo family and is the nephew of Carmine Persico.

The racketeering acts alleged against these defendants include the murder of Joseph Scopo (alleged against Guerra, Persico and Persico, Jr.), the murder of Michael Devine (alleged against Guerra), the conspiracy to murder John Doe #3 (alleged against Persico, Jr.), witness tampering (alleged against Persico, Jr.), the extortion of John Doe #2 (alleged against

3

Persico) and other crimes, all in connection with the defendants'
membership in or association with the Colombo family.

A.   <u>Murder of Joseph Scopo</u>

As alleged in Racketeering Act Three of Count One,
between June 20, 1991, and October 20, 1993, Guerra, Persico and
Persico, Jr., together with others, conspired to murder, and in
fact murdered, Joseph Scopo.  Scopo was murdered as he got out of
the passenger seat of a vehicle parked in front of his residence
in Ozone Park, Queens, on October 20, 1993.  Scopo was murdered
in connection with the Colombo family war, during which the
Colombo family split into two feuding factions, one loyal to
Carmine "the Snake" Persico (the "Persico faction") and the other
loyal to Victor "Vic" Orena (the "Orena faction").  Guerra,
Persico and Persico, Jr., were loyal to the Persico faction.
Scopo was, at the time of his murder, the underboss of the
Colombo family, and he was loyal to the Orena faction.  He was
the final casualty in the Colombo family war.

Guerra, Persico and a cooperating witness ("CW1"),
together with others, planned and carried out the Scopo murder at
the direction of Persico, Jr.  Although Persico, Jr., was
incarcerated at the time of the murder, he obtained permission to
attend the August 1993 wake of his grandmother, where he
instructed Guerra, CW1 and others to murder Scopo in order to win
the war against the Orena faction.  Persico provided guidance to

4

Guerra, CW1 and others regarding the murder.  For example, Persico insisted that Guerra and CW1 carry out the murder prior to the release from prison of Alphonse "Allie Boy" Persico, who was Carmine Persico's son, Persico's brother and Persico, Jr.'s cousin.  Persico also arranged to provide the firearms to be used in the Scopo murder.

### B.   Murder of Michael Devine

As alleged in Racketeering Act Four of Count One, on January 24, 1992, Guerra, together with other associates of the Colombo family, conspired to murder, and in fact murdered, Michael Devine.  Devine was murdered in the underground garage of the apartment building in Staten Island where he lived.  He was murdered in retaliation for dating the wife of Alphonse "Allie Boy" Persico, who was incarcerated at the time.  Guerra admitted his participation in the murder to multiple cooperating witnesses.

### C.   Conspiracy to Murder John Doe #3

As alleged in Racketeering Act Eight of Count One, on May 25, 2004, Persico, Jr., and co-defendant Edward Garofalo conspired to murder John Doe #3.  In a conversation that was recorded on that date, Persico, Jr., and Garofalo discussed retaliating against John Doe #3, who they believed had spoken disrespectfully about them.  During that conversation, as they drove to see another Colombo family member in order to seek

permission to kill John Doe #3, Garofalo told one of the passengers in the car to "clean" the bullets of fingerprints from the gun that Persico, Jr., was carrying.

D.   <u>Witness Tampering</u>

As alleged in Racketeering Act Ten of Count One, on November 15, 2004, Persico, Jr., and Garofalo intimidated and threatened John Doe #5 in order to prevent him from reporting a violent crime in-aid-of racketeering to law enforcement.  In particular, Garofalo was recorded pursuant to a court-authorized wiretap discussing his assault of John Doe #5 and how he had threatened John Doe #5, through John Doe #5's employer, to prevent John Doe #5 from reporting the assault to law enforcement.

E.   <u>Extortion of John Doe #2</u>

As alleged in Racketeering Act Twelve of Count One and charged in Counts Four and Five, between June 2007 and June 2009, Persico and co-defendant Anthony Preza conspired to extort, and in fact extorted, John Doe #2.  In particular, Persico and Preza, relying on their association with the Colombo family, induced John Doe #2 to refrain from operating a commercial business by instilling in him a fear that if he operated that business, he or others would suffer physical or economic harm.

<u>DISCUSSION</u>

The government respectfully submits that evidence of the crimes and other bad acts described below is admissible as evidence of the charged racketeering conspiracy and as necessary background.  Moreover, evidence of certain of these acts is also admissible under Rule 404(b) of the Federal Rules of Evidence.

I.   <u>Legal Standard</u>

A.   Evidence of Other Acts Is Admissible to
     <u>Establish the Racketeering Enterprise and Conspiracy</u>

In general, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  However, it is well established that, pursuant to Rule 404(b), "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).

It is also well established that "'evidence of uncharged criminal activity is not considered other crimes evidence under Rule 404(b) . . . if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'"  <u>United States v. Carboni</u>, 204 F.3d 39, 44

7

(2d Cir. 2000) (quoting United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994); United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same).

Moreover -- and significantly -- in racketeering conspiracy cases, the Second Circuit has repeatedly held that evidence of "other" or "uncharged" crimes is admissible to establish the existence of an enterprise or a conspiracy without reliance on Rule 404(b). For example, in United States v. Baez, 349 F.3d 90, 93 (2d Cir. 2003), the Second Circuit affirmed a district court's admission of sixteen uncharged robberies, noting that "[i]t is well settled that in prosecutions for racketeering offenses, the government may introduce evidence of uncharged offenses to establish the existence of the criminal enterprise." In other words, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy [] is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992). Therefore, crimes committed in furtherance of a racketeering enterprise are admissible as direct evidence of an enterprise or conspiracy, without regard to Rule 404(b). See United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of uncharged murders admissible to prove relationship and continuity of RICO enterprise's illegal activities).

The Second Circuit's opinion in United States v. Wong, 40 F.3d 1347 (2d Cir. 1994), is particularly instructive.  In that case, the Second Circuit held that the district court properly admitted testimony of an uncharged shootout between rival gangs.  In affirming the district court's ruling, the Second Circuit reasoned as follows:

> [T]he evidence [of uncharged acts] was admissible to prove the existence and nature of the Green Dragons "enterprise" and the participation of defendants-appellants in that enterprise, rather than as evidence of other crimes under Rule 404(b).  The court determined that although other evidence had been admitted regarding the defendants' violent conduct, the challenged evidence was not cumulative because "there is no piece of evidence that the government has proffered that I do not expect will be subject to challenge, if not here during the evidentiary phase of the trial, [then] during summations of counsel."

Id. at 1378.  The Second Circuit held that "this evidence was probative of the existence, organization and nature of the RICO enterprise, a central allegation in the indictment."  Id. at 1378.  Therefore, "'the fact that it may also have been probative of a separate uncharged crime is irrelevant.'"  Id. (quoting United States v. Coiro, 922 F.2d 1008, 1016 (2d Cir. 1991)).[2]

Similarly, in United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999), the Second Circuit affirmed the admission of

_____

[2]     The Second Circuit further held that the district court acted well within its discretion in concluding that the evidence was admissible under Rules 401 and 403.

numerous uncharged criminal acts admitted as "enterprise evidence," i.e., to establish the existence of the charged enterprise, including evidence of drug trafficking, possession of weapons, assaults in aid of racketeering, robbery and related acts of violence.  The Second Circuit specifically held that this evidence was not subject to Rule 404(b).  Id.  And in United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997), the Second Circuit affirmed the district court's decision to admit evidence of uncharged murders as proof of a RICO enterprise and conspiracy, rather that pursuant to Rule 404(b).  Id. ("The district court concluded that the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice.  Such an assessment is reviewable only for abuse of discretion, and we see no abuse of discretion here." (citations omitted)).  See also United States v. Matera, 489 F.3d 115, 120 (2d Cir. 2007) (upholding the admission of uncharged murders to prove the existence of the Gambino family); United States v. Mejia, 545 F.3d 179, 206-07 (2d Cir. 2008) (reiterating Matera and concluding that the admission of evidence of a prior uncharged shooting was proper as the shooting demonstrated the existence of the racketeering enterprise and the existence of the conspiracy with which the defendants were charged).

10

Evidence of "other" or "uncharged" crimes is particularly relevant when defendants are charged with committing crimes as part of a racketeering conspiracy, in light of the elements necessary to prove the existence of such a conspiracy. A racketeering conspiracy is "an agreement to conduct or to participate in the conduct of the enterprise's affairs through a pattern of racketeering activity." United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009). As the Second Circuit has explained, a racketeering conspiracy is not merely a conspiracy to commit predicate acts, because "it is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the combination of these two elements[.]" Id. at 463 (citation and quotation marks omitted). In addition, the Second Circuit has made clear that although a defendant charged with a racketeering conspiracy must agree that a conspirator will commit at least two predicate acts, "to demonstrate a pattern of racketeering, in the end, it is not the number of predicates proved but, rather, the relationship that they bear to each other or to some external organizing principle that indicates whether they manifest the continuity required to prove a pattern[.]" Id. at 465 (citation and quotation marks omitted).

11

B.    Evidence of Uncharged Crimes Is Admissible as
Background, To Complete the Story and to
Show Relationships of Trust

The Second Circuit has repeatedly permitted the

admission of evidence of other bad acts to provide background

information to inform the jury of the complete story relating to

the crime charged.  See United States v. Williams, 205 F.3d 23

(2d Cir. 2000); United States v. Pipola, 83 F.3d 556, 566 (2d

Cir. 1996) ("One legitimate purpose for presenting evidence of

extrinsic acts is to explain how a criminal relationship

developed; this sort of proof furnishes admissible background

information in a conspiracy case."); United States v. Langford,

990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's

discretion to admit evidence of acts committed prior to the time

charged in the indictment to prove the existence of the alleged

conspiracy as well as to show its background and history.");

United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993)

(holding that co-defendants' relationship over a 14-year period,

during which stolen property and narcotics crimes were committed,

"was properly admitted to explain how the illegal relationship

between the two [defendants] developed and to explain why [one

defendant] . . . appointed [the other defendant] . . . to a

leading position in the Organization"); United States v. Pitre,

960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be

admitted to inform the jury of the background of the conspiracy

12

charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").

In Williams, the Second Circuit upheld the admissibility of evidence relating to the defendant's prior criminal activities - including marijuana distribution, credit card fraud and filing false charges of assault - with two co-conspirators involved in the charged conspiracy to distribute cocaine.  In reaching this conclusion, the Second Circuit held that "evidence of [the defendant's] prior criminal conduct with his co-conspirators was relevant to 'inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed.'"  205 F.3d at 33-34.

In addition, and more specifically, the Second Circuit has repeatedly and consistently held that evidence pertaining to how members of a conspiracy met, committed crimes together and grew to trust each other over time is relevant and admissible to explain the relationship between a defendant and his co-conspirators in the charged conspiracy.  See Williams, 205 F.3d at 33-34; United States v. Pascarella, 84 F.3d 61, 72-73 (2d Cir. 1996); United States v. Pipola, 83 F.3d 556, 565 (2d Cir. 1996); United States v. Araujo, 79 F.3d 7, 8 (2d Cir. 1996);

13

United States v. Alli-Balogun, 72 F.3d 9, 11-12 (2d Cir. 1995);
United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993); United
States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992); United
States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990).  In
interpreting Rule 404(b), the Second Circuit routinely has
sanctioned the government's use of such evidence as a means of
providing the jury with background information as to the charged
crimes and an explanation of the development of criminal
relationships.  See Williams, 205 F.3d at 33-34; Pipola, 83 F.3d
at 566; Rosa, 11 F.3d at 333-34.

   In United States v. Gonzalez, 110 F.3d 936, 941-42 (2d
Cir. 1997), in which the defendants were charged with being
felons in possession of firearms, the Second Circuit affirmed
admission of evidence regarding a burglary because it was
relevant to both motive for defendants' possession of firearms
and to provide "crucial background evidence that gave coherence
to the basic sequence of events that occurred on the night" of
the defendants' arrest.  In rejecting the defendant's claim to
preclude this evidence pursuant to Rule 404(b), the court held:

> It is well established that "evidence of
> uncharged criminal activity is not considered
> 'other crimes' evidence under Fed. R. Evid.
> 404(b) if it 'arose out of the same
> transaction or series of transactions as the
> charged offense, if it [is] inextricably
> intertwined with the evidence regarding the
> charged offense, or if it is necessary to
> complete the story of the crime [on] trial.'"

14

Id. (quoting United States v. Towne, 870 F.2d 880, 886 (2d. Cir. 1989) (emphasis added)).  Thus the evidence of the burglary was admitted pursuant to Rule 401, after a Rule 403 determination that the probative value of the evidence outweighed its prejudicial impact.

Moreover, to the extent that evidence of an uncharged crime includes an inculpatory admission by a cooperating witness who participated in the uncharged crime jointly with a defendant, such evidence also is admissible to corroborate the witness's testimony.  See United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987); United States v. Mejia-Valez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

C.    Evidence of Other Acts Is Admissible to Establish Motive, Opportunity, Intent, Preparation, Plan, Knowledge, Identity or Absence of Mistake or Accident

Evidence of uncharged crimes or "other acts" is admissible pursuant to Rule 404(b) if it is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  See United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).

While the government "must explain in detail the purposes for which the evidence is sought to be admitted," United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984) (citing United States v. O'Connor, 580 F.2d 38, 40 (2d Cir. 1978)), the Second Circuit has emphasized that Federal Rule of Evidence 404(b) is a

15

rule of broad reach and liberal application:  "We have adopted
the inclusionary or positive approach to [404(b)]; as long as the
evidence is not offered to prove propensity, it is admissible."
Id.

        The Second Circuit has identified three prerequisites
for the admission of "other crimes" evidence under Rule 404(b).
First, a trial court must determine whether the evidence is
offered for a purpose other than to prove the defendant's bad
character or criminal propensity.  <u>Pitre</u>, 960 F.2d at 1119;
<u>United States v. Mickens</u>, 926 F.2d 1323, 1328 (2d Cir. 1991).
Second, the trial court must determine whether the evidence is
relevant under Rules 401 and 402 of the Federal Rules of Evidence
and whether its probative value is not substantially outweighed
by the danger of unfair prejudice under Rule 403.  <u>Pitre</u>, 960
F.2d at 1119; <u>Mickens</u>, 926 F.2d at 1328.  Third, the court must
provide an appropriate limiting instruction to the jury, if one
is requested.  <u>Pitre</u>, 960 F.2d at 1119.

II.  <u>The Defendants' Other Acts Are Admissible</u>

        During the course of their involvement in the
racketeering conspiracy charged in Count One, Guerra, Persico and
Persico, Jr., as part of the criminal enterprise charged in Count
One, <u>i.e.</u>, the Colombo family, engaged in a variety of bad acts,
including criminal acts, that constitute evidence of the charged
conspiracy but are not identified as specific racketeering acts.

That is, the discrete racketeering acts alleged in the Indictment constitute only some of the criminal activities in which the defendants engaged during their extended association with and/or membership in the Colombo family.  As discussed below, each of the other acts the government seeks to introduce at trial involved the participation of other members and associates of the Colombo family and related to the affairs of the Colombo family. Accordingly, the government respectfully submits that this evidence is admissible to prove the racketeering conspiracy itself, as direct proof of the structure and organization of the charged racketeering enterprise, the defendants' association or membership, and ongoing participation, in the enterprise's illegal activities, and the existence, nature and continuity of the charged racketeering conspiracy.  The acts are also admissible as inextricably intertwined background that is necessary to complete the story of the defendants' crimes and to show relationships of trust.[3]  In addition, certain of the acts are admissible pursuant to Rule 404(b) because they are relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

        The government seeks to prove the criminal acts listed below through cooperating witness testimony, consensual

---

[3]  The government also respectfully submits that most, if not all, of the acts set forth herein also constitute <u>Giglio</u> material that will be elicited during the direct examination of the government's witnesses.

17

recordings made by cooperating witnesses, and other evidence. The relevant cooperating witnesses are referred to herein as "CW1" through "CW8." At trial, the government expects to establish that CW1 was an associate, soldier and acting captain in the Colombo family who was closely associated with Guerra and Persico, Jr., and who participated in the Colombo family war and participated in the affairs of the Colombo family until January 2011. CW2 was, <u>inter</u> <u>alia</u>, an associate of, and an accountant for, Persico. CW3 was an associate, soldier and captain in the Colombo family who participated in the Colombo family war and participated in the affairs of the Colombo family until January 2009. CW4 was a criminal associate of Persico, Jr., and Guerra who was ultimately released by Persico, Jr., to the Gambino family. CW5 was an associate of the Decalvacante family and the Colombo family who, together with Persico, Persico, Jr., and others, owned and operated a trucking company for the benefit of the Colombo family. CW6 was an associate, soldier and captain in the Colombo family who participated in the affairs of the Colombo family until January 2011. CW7 was an associate of the Genovese family who, at times relevant to the charges in this case, was represented by Persico during two different disputes involving organized crime figures. CW8 was a long-time associate of the Colombo family who participated in the affairs of the Colombo family until May 2009 and then made consensual recordings until

18

January 2011.  While CW8 made these recordings, he was assigned to the crew of Persico, Jr.

      A.   <u>Murder and Murder Conspiracies</u>

          1.  <u>Murder of Joseph Lalima</u>

In approximately 1990, Joseph Lalima operated a company called White Cap Linen.  CW2 is expected to testify that Persico directed him to review the accounting records for Lalima's company because Persico had a financial stake in it.  CW2 reported to Persico that he was unable to determine how much money Persico was owed because the company's financial records were in disarray.  CW2 complained that Lalima was not providing sufficient information regarding the company's finances and that Lalima frequently discussed the business over the phone, which concerned CW2 because of the possibility that the phones were being electronically monitored by law enforcement agents.

CW2 is expected to testify that after advising Persico of these issues, Persico summoned CW2 to a meeting in lower Manhattan with Lalima, Persico, Theodore Persico, Sr. (Persico's uncle and Persico, Jr.'s father) and Frank Sparaco (a Colombo family associate).  During the meeting, Persico, Sr., yelled at Lalima and directed him to stop calling CW2 on the phone and to provide CW2 all the information he requested about the company's financials.  However, Lalima still failed to provide adequate information regarding the company's financials.  Some time after this meeting took place in lower Manhattan, Persico offered to

19

sell CW2 one of Lalima's watches, telling CW2 that Lalima would no longer need the watch.  CW2 is expected to testify that he never saw Lalima again and learned that he was murdered.

The murder of Lalima is probative of the Colombo family's commitment to generating money through criminal activities, including murder (Ind. ¶ 8), and demonstrates the "existence and nature" of the Colombo family.  Wong, 40 F.3d at 1378; see also Diaz, 176 F.3d at 79; Miller, 116 F.3d at 682.  It is also probative of Persico's agreement to further the goals of the racketeering enterprise, and of the threat of continued criminal activity.  Pizzonia, 577 F.3d at 465 ("[T]he threat of continued criminal activity over an open period can be established where discrete predicates can be attributed to a defendant operating as part of a long-term association that exists for a criminal purpose.").

In addition, the Lalima murder is admissible as background, because CW2 is the victim of the extortionate extensions of credit alleged in Racketeering Acts One and Two, and the Lalima murder provided a reason for him to fear the consequences of not repaying those extensions of credit.  Williams, 205 F.3d 23; Pipola, 83 F.3d at 566; Langford, 990 F.2d at 70.  CW2's testimony regarding Lalima also reflects Persico's trust in CW2 and his reliance on CW2 to gather information about whether Lalima was ignoring his obligations to the Colombo family.  United States v. Clemente, 22 F.3d 477, 483 (2d Cir.

20

1994) (affirming district court's admission of uncharged acts and
noting that "Judge Glasser permitted testimony about certain
uncharged acts to be admitted for the purpose of demonstrating,
with respect to the RICO counts, 'an enterprise . . . and . . .
the relationship of trust between the parties'").

  2. <u>Conspiracy to Murder Bruce Black</u>

  CW2 is expected to testify that in the late 1980s, he
and others invested substantial money with Bruce Black.  CW2
requested that Black purchase a life insurance policy designating
CW2 as the beneficiary so that CW2's investment would be
protected in the event that Black died.  Subsequently, the
investment failed and CW2 and the other investors lost money.
CW2 explained the situation to Persico in an effort to solicit
Persico's assistance in having Black killed so that CW2 could
collect the life insurance proceeds.  Persico offered to arrange
Black's murder in exchange for a portion of the life insurance
proceeds.  To assist in making the arrangements, Persico asked
CW2 to provide a photograph of Black.  CW2 then decided against
the plan and, accordingly, he and Persico called it off.

  The conspiracy to murder Bruce Black also establishes
that the participants in the racketeering conspiracy were willing
to use murder to further their monetary goals.  In addition, and
for the same reasons that applied to the Lalima murder, it is
critical background as to Racketeering Acts One and Two and
provided a reason for CW2 to fear the consequences of not

repaying the extensions of credit underlying Racketeering Acts
One and Two.

        3.  <u>Murder of Steven Piazza</u>

        Piazza, who was married to Persico's sister, was
murdered in 1985.  While the government does not intend to
introduce evidence that the defendants murdered Piazza, the
government does intend to introduce a conversation between CW2
and Persico regarding the murder.  CW2 is expected to testify
that he learned from Persico that Piazza had cheated on his wife,
<u>i.e.</u>, Persico's sister.  After Piazza was murdered, Persico
advised CW2 that murder is the way infidelity is punished in
"this life," meaning the life of organized crime.

        The conversation between CW2 and Persico regarding the
Piazza murder is admissible because it shows Persico's commitment
to "this life," <u>i.e.</u>, to the charged enterprise.[4]  In addition,
it establishes that the Colombo family will from time to time use
its resources "to settle personal grievances and vendettas" (Ind.
¶ 9), which is critical background to the Devine murder alleged
in Racketeering Act Four.  Finally, this evidence again
demonstrates that Persico communicated with CW2 about crimes in
an effort to ensure that CW2 understood the rules of the

---

      [4]    The government respectfully submits that these
statements are not covered by Rule 404(b), but are instead
admissions of a party-opponent, and therefore admissible pursuant
to Fed. R. Evid. 801(d)(2).  The government includes notice of
these statements in an abundance of caution.

enterprise and the potential consequences of failing to obey
them, which in this case meant educating CW2 about how the
Colombo family punished marital infidelity.

     4.  <u>Murder of Steven Mancusi</u>

     CW1 is expected to testify about conversations he had
with Guerra in which Guerra admitted his role in the murder of
Steven Mancusi.  CW1 is expected to testify that he was initially
asked by another Colombo family associate to participate in the
murder.  After the murder took place, Guerra advised that he and
two other Colombo family associates, including Frank Sparaco,
lured Mancusi to a store in Brooklyn, New York, where they shot
and killed him.  Guerra further advised that one of the
associates had stolen a car that they had used to move Mancusi's
body out of the store.  More recently, after Guerra feared that
one of the associates involved in the murder was cooperating with
the government, Guerra told CW1 on more than one occasion that he
regretted his involvement in both the Mancusi murder and the
Devine murder, which is alleged in Racketeering Act Four.

     Evidence of the Mancusi murder is admissible because it
is evidence of Guerra's intent to participate in crimes with the
Colombo family and, more specifically, with Sparaco, with whom he
participated in the Devine murder.  It also demonstrates the
relationship of trust between Guerra and CW1, to whom Guerra
admitted the Devine murder, and with whom Guerra committed the
Scopo murder alleged in Racketeering Act Three and the extortion

23

alleged in Racketeering Act Twenty.  <u>Clemente</u>, 22 F.3d at 483.
Furthermore, Guerra's admissions regarding the Mancusi murder are
admissible because they are "inextricably intertwined" with his
admissions regarding the Devine murder, as Guerra advised CW1 in
the same conversations that he regretted participating in both
murders with Sparaco.  <u>Gonzalez</u>, 110 F.3d at 941-42.

     5.  <u>Colombo Family War Murder Conspiracy</u>

     Multiple cooperating witnesses will testify about
Guerra's participation in the Colombo family war, the violent
conflict between two factions of the Colombo family -- the
Persico faction and the Orena faction -- that occurred between
1991 and 1993.  For example, CW1 will testify that he and Guerra,
who were aligned with the Persico faction, were involved in
surveilling Colombo family captain "Wild Bill" Cutolo, who
aligned himself with the Orena faction, for the purpose of
murdering him.  CW3 will also testify that he and Guerra
conducted surveillance of Cutolo during this period for the
purpose of murdering him.  CW4 will testify that after an
innocent worker was mistaken for Guerra or another Persico
faction member and killed at Guerra's place of business, Guerra
began to target Louis "Bo Bo" Malpeso, who was aligned with the
Orena faction and who he believed to be responsible for the
murder in the bagel store.  CW4 will testify that, on another
occasion, after Guerra learned about an Orena faction member's

possession of a hit list with Persico faction names on it, CW4 stopped Guerra from trying to murder the Orena faction member.

The government also intends to introduce additional testimony and evidence regarding the Colombo War. Much of this evidence relates directly to the murder of Joseph Scopo, and thus, is not the subject of this motion. However, the government intends to introduce conversations with P. Bombino, recorded by CW5, in which P. Bombino discusses the involvement of the defendants and their co-conspirators in the Colombo family war. For example, during a recorded conversation on September 15, 2009, P. Bombino explained that Thomas Petrizzo was opposed to the Persico family during the war, but that his life was spared because his daughter married Michael Persico. During another conversation on January 22, 2009, P. Bombino explained that Garofalo had "done a couple of nice things during the war," that the Persicos consider that to be an honor, and that if Garofalo ever cooperated, Persico, Jr., would go to jail for the rest of his life.

This evidence regarding the Colombo family war, and in particular, the fact that Guerra conspired to murder members of the Orena faction, is admissible on several independent grounds. First, it is highly probative of the existence of the enterprise, Guerra's participation in that enterprise and his commitment to the goals of that enterprise. Second, it is critical background

25

evidence of the Scopo murder alleged in Racketeering Act Three, which was the final murder in the Colombo family war.

Third, it is critical to establishing the relationship of trust between Guerra and CW1, to whom Guerra admitted the Devine murder alleged in Racketeering Act Four, and with whom Guerra committed the Scopo murder alleged in Racketeering Act Three and the extortion alleged in Racketeering Act Twenty. Without this testimony, the jury will be left to doubt CW1's credibility -- which the defense will no doubt vigorously attack -- as to the admissions Guerra made to him.[5]

Fourth, pursuant to Rule 404(b), evidence regarding the Colombo family war murder conspiracy is probative of motive and absence of mistake or accident as to the Scopo murder, because it establishes that Guerra participated in the war that was the cause of Scopo's death.  Fifth, also pursuant to Rule 404(b), this evidence is admissible as proof of identity.  Identity is always at issue when defendants claim, as Guerra will undoubtedly claim, that they did not commit the charged crime.  United States

---

[5]      Clearly, the probative value of this evidence is not "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.  See, e.g., Roldan-Zapata, 916 F.2d at 804 (in prosecution for conspiracy to distribute drugs, evidence of defendant's prior drug dealing with co-conspirator was not unduly prejudicial); United States v. Brennan, 798 F.2d 581, 589-90 (2d Cir. 1986) (evidence of defendant's prior involvement in fixing a case not unduly prejudicial; admissible to help jury understand contours of illegal relationship between defendant and government witness); accord United States v. Harris, 733 F.2d 994, 1006 (2d Cir. 1984) (collecting cases).

v. Danzey, 594 F.2d 905, 913 (2d Cir. 1979) (in context of Rule 404(b), "identity" is "used as a shorthand for referring to proof of the doing of the criminal act by this defendant").

### 6. Accessory After the Fact to the Murder of John Sparacino

CW1 is expected to testify that after he, Guerra, John Pappa, John Sparacino and others participated in the murder of Joseph Scopo, Sparacino was murdered, and CW1 and Guerra were asked by Pappa to help dispose of Sparacino's body.  CW1, Guerra and another criminal associate stole a car and brought it to the house where Sparacino had been murdered.  CW1 then helped Pappa load Sparacino's body into the stolen car.  This murder is admissible in order to complete the story of the Scopo murder, as Sparacino was murdered at least in part because of the perception that he was taking excessive credit for his role in that murder. In addition, this murder is highly probative of the enterprise and of Guerra's commitment to the goals of the enterprise, and, like the Colombo family war murder conspiracy, is critical to establishing the relationship of trust between Guerra and CW1.

### 7. Conspiracy to Murder Benny Geritano

CW1 will testify that, after the Scopo and Sparacino murders, Pappa believed that an organized crime associate named Benny Geritano was looking to kill him, and that Pappa then asked for CW1's and Guerra's help in surveilling Geritano for the purpose of killing him.  CW1 will further testify that on at

27

least one occasion, he and Guerra in fact surveilled Geritano
with Pappa in anticipation of killing him.  This murder
conspiracy is highly probative of the existence of the enterprise
and of the commitment of Guerra, CW1 and Pappa to the enterprise,
which is significant because those three individuals participated
in the Scopo murder on behalf of the enterprise.  In addition,
this murder conspiracy demonstrates the relationship of trust
that existed among Guerra, CW1 and Pappa at and around the time
of the Scopo murder.

8.   <u>Conspiracy to Murder the Clemenzas</u>

CW1 will testify that when Alphonse Persico, who is
Persico's brother and Persico, Jr.'s cousin, came home from
prison, he and Guerra reported to Alphonse Persico.  On one
occasion, Alphonse Persico was upset that the Clemenzas refused
to come back into the Colombo family after the Colombo War, and
Guerra and CW1 surveilled a location with the intention of
murdering them.  This is highly probative evidence of Guerra's
and CW1's role in, and commitment to, the enterprise, as well as
of the relationship of trust they shared with each other and with
the leadership of the enterprise.

9.   <u>Conspiracy to Murder Joel Cacace</u>

CW4 will testify that Persico, Jr., asked him to
accompany Persico, Jr., and Frank Smith, a close associate of
Persico, Jr.'s, to see Joel Cacace, also known as "Joe Waverly,"
a powerful member of the Colombo family, who they believed was

28

going to murder Frank Smith.  Persico, Jr., told CW4 that if Waverly resisted when Persico, Jr., told Waverly that Smith would now be accountable to him and not Waverly, CW4 should be prepared to shoot Waverly in the head.  This is highly probative evidence of Persico, Jr.'s commitment to the goals of the charged enterprise, as well as of his important position within the enterprise.

    B.   <u>Loansharking</u>

        1.   <u>Loansharking by Michael Persico</u>

      The government expects multiple cooperating witnesses to testify about loansharking loans extended by Persico to others, including to Colombo family associates.  For example, CW5 is expected to testify that Persico loaned money to co-defendant Edward Garofalo, who needed additional funds for the operation of Big R Trucking, a company owned jointly by CW5 and Garofalo.  These loans are also the subject of consensual recordings.

      Similarly, CW1 and CW2 are expected to testify about additional sums of money that Persico loaned, or arranged for others to loan, to individuals, including other Colombo family members and associates, and Persico's involvement in directing the collection of those monies.  For example, CW1 is expected to testify that at the time Persico loaned money to CW1 and Guerra, Persico also loaned approximately $500,000 to others, with the understanding that extortionate means would be used to collect the debts.  CW1 is also expected to testify that Persico directed

29

CW1 and Guerra to collect loansharking money owed to Persico and others from other associates of the Colombo family and other individuals.

This evidence is highly probative of Persico's commitment to the goals of the enterprise, which include generating money through loansharking.  (Ind. ¶ 8.)  It also demonstrates the relationships of trust among Persico, CW1 and Guerra, who participated in the racketeering conspiracy and Scopo murder together.

2.   <u>Loansharking by Francis Guerra</u>

CW1 is expected to testify that he and Guerra had a loansharking business together in the mid-1990s.  Together, they used extortionate means to collect from a number of their customers, including individuals identified as Santo, Tony and Lenny.  For example, with regard to the extortion of Lenny, CW1 and Guerra had lent Lenny money they had received from Persico.  When Lenny failed to repay them, Persico directed them to get the money back, which resulted in CW1's assaulting Lenny for nonpayment as Guerra stood nearby.  Persico similarly directed Guerra and Russo to collect money they had borrowed from Persico and loaned to Tony, which they did through extortionate means.  This evidence demonstrates Guerra's commitment to the goals of the enterprise, which include generating money through loansharking.  (Ind. ¶ 8.)  It is also probative of the relationships of trust that existed among Persico, CW1 and

30

Guerra, who participated in the racketeering conspiracy and Scopo murder together.

    C.   <u>Drugs</u>

        1.   <u>Cocaine Distribution and Related Extortion</u>

CW4 is expected to testify that he ran a cocaine distribution operation with Persico, Jr., in the 1980s that employed Guerra.  As part of their control of the neighborhood's cocaine distribution ring, CW4 and Persico, Jr., extorted other individuals selling drugs in the neighborhood by forcing them to pay protection money.  CW1 is further expected to testify about his involvement in cocaine distribution in the 1980s and his discussions with Guerra and Persico, Jr., about their involvement in cocaine distribution in the same neighborhood in the same time period.  This evidence establishes Persico, Jr.'s and Guerra's commitment to the goals of the enterprise, which include generating money through drug trafficking.  (Ind. ¶ 8.)  It also establishes the relationships of trust among Guerra, Persico, Jr., and CW1, who participated in the racketeering conspiracy and Scopo murder together.

        2.   <u>Marijuana Distribution</u>

CW6 is expected to testify that he and a high-ranking member of the Colombo family discussed participating in the importation and distribution of marijuana from Canada.  CW6 would not participate in this scheme without permission from Colombo family boss Carmine "The Snake" Persico.  Because Carmine Persico

31

was incarcerated, CW6 discussed the potential scheme with Persico, the son of Carmine Persico, and Persico indicated that he was considering making the decision to grant or deny permission. CW6 indicated to Persico that he would not proceed with the scheme unless he received permission from Carmine Persico. This is critical evidence of Persico's participation in, and important role in, the charged enterprise. In particular, this demonstrates that CW6, a long-time associate and member of the Colombo family, understood that Persico, though an associate and not a soldier, was in fact the best conduit to the official boss of the Colombo family.

     D.   <u>Extortion</u>

          1.   <u>Guerra's Involvement in Extortion</u>

     The government intends to introduce testimony of CW1 regarding extortions he committed with Guerra in the 1990s and 2000s. For example, CW1 is expected to testify that he and Guerra threatened the owners of a "boiler room" operation when the owners refused to let an associate of Guerra's and CW1's take his client book with him when he left the operation. CW1 is also expected to testify that CW1, Guerra and other Colombo family associates assaulted one of the owners of the operation, that one of the associates carried a blackjack as a weapon and that they held the victim out the window of his office, which was located on an upper floor of a tall building. Subsequently, Guerra and

CW1 demanded payments from their associate in exchange for the protection they had provided him.

CW1 is further expected to testify about his involvement with Guerra in the assault of another stockbroker who owed money to one of their associates. After the assault, Guerra and CW1 were contacted by a member of the Gambino family, who advised that the victim had come to him for protection. The Gambino family associate then delivered to CW1 and Guerra the money that the stockbroker owed.

This demonstrates Guerra's commitment to the goals of the charged enterprise, which include generating money through extortion. (Ind. ¶ 8.) It also demonstrates the relationship of trust, and agreement to commit crimes, between Guerra and CW1, who were co-conspirators in not only the Scopo murder alleged in Racketeering Act Three but also the extortion alleged in Racketeering Act Twenty.

2.   Persico and Persico, Jr.'s Involvement in Extortion

The government intends to introduce consensual recordings made by CW8, who was an associate in CW1's crew, prior to the time CW1 began cooperating with the government, as well as the testimony of CW1, regarding a dispute over money owed to the Colombo family administration by one of their associates. The associate sought CW1's assistance in lowering the yearly tribute payment he was required to make from his gambling business to the

33

leaders of the Colombo family.  Consensual recordings and the testimony of CW1 are expected to establish that members of the Colombo family, including Persico, Jr., and Persico refused to reduce the amount of tribute the associate was required to repay.

CW1 is also expected to testify regarding protection money collected by Persico, Jr., from another Colombo family associate.  After Persico, Jr., was arrested in 2010, Persico, Jr., instructed CW1 to continue collecting protection money from this associate, and insisted that the associate should pay $400 each month to Persico, Jr.'s mother to help her with her car payments.

CW1 will also testify that shortly after Persico, Jr.'s arrest in this case, CW1 was asked to help a Colombo family associate collect money owed to Persico, Jr., from an illegal gambling operation associated with the Gambino family.  Prior to Persico, Jr.'s arrest, he had been responsible for the collection.  Thereafter, CW1 participated in meetings with members of the Gambino family, collected a portion of the outstanding money and provided it to a close associate of Persico, Jr., for Persico, Jr.

This evidence is highly probative of Persico and Persico, Jr.'s commitment to the goals of the charged enterprise, as well as their positions of power and influence within the enterprise.  It also establishes the relationship of trust

34

between Persico, Jr., and CW1, who participated in the Scopo murder alleged in Racketeering Act Three together.

    E.   <u>Bank Burglary</u>

        Both CW1 and CW4 are expected to testify about Guerra's participation with each of them in separate bank burglaries in the 1990s.  Specifically, CW4 first gave Guerra and a criminal associate advice as to how to burglarize banks using, among other things, fake bank deposit night drop boxes.  On one occasion, CW4 went with Guerra to attempt a bank burglary, which was successfully carried out later.  On another occasion, Guerra proposed using a fake night deposit box to CW1, who tried to burglarize two banks with Guerra and others, including other associates of the Colombo family.  This demonstrates Guerra's commitment to the goals of the enterprise and his relationship of trust with CW1, with whom he participated in the Scopo murder and the extortion alleged in Racketeering Act Twenty.

    F.   <u>Settlement of Organized Crime Disputes</u>

        The government intends to introduce evidence that Persico and Persico, Jr., participated in meetings known as "sit-downs," during which they used their influence in the Colombo family to settle disputes that arise within the family and with other families.

        For example, CW1 is expected to testify that one of co-defendant Anthony Preza's employees attempted to sue Preza after the employee was shot while driving one of Preza's company's

cars.  Preza was angry because the employee, who claimed he was shot while working for Preza, had actually taken the car to a neighborhood known to be a location where narcotics are sold, without authorization.  Rather than resolving the dispute in court, Preza contacted Michael Persico, who directed Preza to seek the assistance of CW6.

The government also intends to introduce testimony of CW6 regarding instructions he received from Persico to collect a debt owed by an individual in Florida.  Specifically, CW6 is expected to testify that a relative of one of Persico's close associates was owed money by an associate of the Gambino family. Persico directed CW6 to attend a sit-down in Florida in order to collect the money and resolve the dispute.

Similarly, CW7, a Genovese family associate, is expected to testify regarding Persico's involvement in settling two organized crime disputes.  First, CW7 is expected to testify about Persico's involvement in settling a physical altercation he had with the son of one of Persico's business partners.  After CW7 engaged in the physical altercation, CW7 was instructed to meet with Persico at Romantique Limousine, a company owned by Persico.  At the meeting, Persico's partner informed CW7 that he had sought permission from Persico to seek retribution against CW7, but Persico informed CW7 that he had refused to permit his partner to retaliate because of Persico's friendship with CW7's uncle.  However, Persico warned CW7 that if CW7 engaged in any

36

further altercations with the son of Persico's business partner,
then CW7 "was done" regardless of whether anyone from the
Genovese family stood up for CW7.

CW7 is further expected to testify about another
occasion during which Persico used his influence to settle an
organized crime dispute.  This time, members and associates of
the Genovese family claimed that CW7 owed them money for
allegedly robbing a drug stash house used by a Genovese
associate.  CW7's uncle sought Persico's assistance.  Persico
directed CW7 to pay far less than the Genovese family had
demanded, and advised that this payment would settle the issue.

Similarly, the government intends to introduce
consensual recordings and the testimony of CW1 regarding
Persico's involvement in a dispute between one of his associates
and a Bonanno family captain.  After Persico learned of the
altercation, Persico chastised CW1, who was present during the
altercation, for failing to stand up for the Colombo associate.

These incidents are highly probative of Persico's
commitment to, and position of influence within, the charged
enterprise.  Because Persico may argue to the jury that he was
not associated with organized crime at all, it is critical that
the jury be made aware of these incidents.  In addition, the
"sit-downs" described above are critical evidence of the
enterprise and its manner of operation, and in particular the
manner in which monetary and other disputes are resolved through

37

the criminal enterprise without resort to legal dispute resolution.

        G.    <u>Other Violent Acts</u>

        The government intends to introduce testimony from cooperating witnesses and consensual recordings regarding the use of violence by the defendants in furtherance of the conspiracy. For example, on January 22, 2009, CW5 recorded a conversation with Persico, Jr., and Colombo family associate Patrick Bombino ("P. Bombino") in which Persico, Jr., expressed his belief that violence is the only means of ensuring that others follow his directions. Similarly, in another portion of that conversation, Persico, Jr., indicated that he intended to seek permission from Persico to beat up an individual associated with Frank Leone, a Colombo family associate who borrowed substantial sums of money from the Persico family. In multiple other consensual recordings made by CW8, Persico, Jr., repeatedly threatened to assault an individual who robbed from Bellaluna, a restaurant owned by the Persico family.

        The government intends to introduce similar evidence regarding Guerra. In a consensual recording by CW8, Guerra describes how a female associate of his was assaulted by a man. Guerra is recorded stating that he and Persico, Jr., intended to "slap" the assailant for being disrespectful.

        This evidence shows Persico, Jr.'s and Guerra's commitment to the goals of the charged enterprise, which include

38

the use and threatened use of physical violence both to further
its criminal moneymaking activities and to settle personal
grievances and vendettas.  (Ind. ¶¶ 8-9.)

      H.   <u>Illegal Gambling</u>

      CW1 is also expected to testify that when he and Guerra
came home from prison in the 2000s, Guerra told CW1 that the
money put in their commissary accounts originated from joker-
poker machines that were controlled by Persico and had been
placed in businesses associated with the Colombo family.  This is
highly probative evidence of Guerra's, Persico's and CW1's
commitment to the charged enterprise and to each other, a
relationship based in part on their participation in the Scopo
murder, which allowed the Persico faction to win the Colombo
family war.

*     *     *

      For all of the aforementioned reasons, these acts are
admissible because they are highly probative of the existence of
the charged enterprise, the goals of the enterprise, the
defendants' commitment to the enterprise and its goals, and the
relationships of trust among the defendants and their co-
conspirators.  In addition, the defendants' continued reliance
upon the cooperating witnesses demonstrates that the defendants
were candid and trusting of them in planning and carrying out the
crimes with which the defendants are charged.  And, to the extent
that certain of the acts are admissible pursuant to Rule 404(b),

39

the probative value of those acts is not substantially outweighed by any prejudicial effect, because those acts "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants are] charged.'"   Pitre, 960 F.2d at 1120 (quoting Roldan-Zapata, 916 F.2d at 804).   In addition, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is admissible under the Rule 403 balancing test.   United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999); see also United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006) (observing that evidence admissible pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice where the it does not "involve conduct more inflammatory than the charged crime").   Finally, any potential prejudice can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.   United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991).

<u>CONCLUSION</u>

For the reasons set forth above, the government's motion <u>in</u> <u>limine</u> to admit evidence of the defendants' other criminal and bad acts should be granted.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

Nicole Argentieri
Rachel Nash
Allon Lifshitz
Assistant U.S. Attorneys
      (Of Counsel)

41